# NANTAHALA POWER & LIGHT CO. ET AL. *v.* THORNBURG, ATTORNEY GENERAL OF NORTH CAROLINA, ET AL.

No. 85–568.   Argued April 21, 1986—Decided June 17, 1986

954

O'CONNOR, J., delivered the opinion of the Court, in which all other Members joined, except POWELL and STEVENS, JJ., who took no part in the consideration or decision of the case.

*Rex E. Lee* argued the cause for appellants. With him on the briefs were *David W. Carpenter, Ronald D. Jones, David R. Poe, M. Reamy Ancarrow, Edward S. Finley, Jr.,* and *William D. Johnson.*

*Deputy Solicitor General Cohen* argued the cause for the United States as *amicus curiae* urging reversal. On the brief for the United States et al. were *Solicitor General Fried, William H. Satterfield,* and *Jerome M. Feit.*

*William T. Crisp* argued the cause for appellees. With him on the brief were *Lacy H. Thornburg,* Attorney General of North Carolina, *pro se, Richard L. Griffin,* Assistant Attorney General, *James D. Little,* and *Robert F. Page.**

JUSTICE O'CONNOR delivered the opinion of the Court.

The Nantahala Power & Light Company (Nantahala) and Tapoco, Inc. (Tapoco), are both wholly owned subsidiaries of the Aluminum Company of America (Alcoa). Tapoco and

---

*Briefs of *amici curiae* urging reversal were filed for the State of Tennessee by *W. J. Michael Cody,* Attorney General, *Jim G. Creecy,* Associate Chief Deputy Attorney General, and *Charles L. Lewis,* Deputy Attorney General; for the Edison Electric Institute by *Robert L. Baum* and *Richard M. Merriman;* and for the New England Electric System by *Frederic E. Greenman.*

Briefs of *amici curiae* urging affirmance were filed for the North Carolina Utilities Commission by *Wilson B. Partin, Jr.;* and for the town of Highlands by *James N. Horwood.*

Nantahala each own hydroelectric powerplants on the Little Tennessee River. Almost all of the power that they produce goes to the Tennessee Valley Authority (TVA). In exchange for allowing TVA to pour into its grid the variable· quantity of power produced by Tapoco's and Nantahala's facilities, Tapoco and Nantahala jointly receive a fixed supply of low-cost "entitlement power" from TVA. In addition, Nantahala buys a variable amount of high-cost "purchased power" from the TVA grid. Tapoco sells all its power to Alcoa; Nantahala serves public customers.

For the purposes of calculating the rate to be charged Nantahala's retail customers, all of whom are in North Carolina, the Utilities Commission of North Carolina (NCUC) chose an allocation of entitlement and purchased power between Tapoco and Nantahala that differs from the allocation of entitlement power between Tapoco and Nantahala adopted by the Federal Energy Regulatory Commission (FERC) in a wholesale ratemaking proceeding. The North Carolina Supreme Court upheld NCUC's allocation. We noted probable jurisdiction to decide whether NCUC's allocation may stand in light of FERC's ruling. 474 U. S. 1018 (1985). We hold that NCUC's allocation of entitlement and purchased power is pre-empted by federal law.

## I

## A

This case involves a number of agreements, all of which concern the power grid of TVA. Under the New Fontana Agreement (NFA), to which TVA, Tapoco, and Nantahala are parties, TVA operates all of Tapoco's hydroelectric facilities and 8 of the 11 dams owned by Nantahala. The facilities operated by TVA produce an amount of power that varies in magnitude with the fullness of the harnessed streams. The NFA gives TVA the right to pour all that power into the TVA grid. In exchange, TVA provides jointly to Tapoco and Nantahala a constant annual allocation of low-cost "enti-

tlement power" of 1.8 billion kilowatt-hours per year. The NFA is on file with FERC as a rate schedule. *Nantahala Power & Light Co.*, 19 FERC ¶ 61,152, p. 61,274 (1982).

Under the 1971 Apportionment Agreement (AA), to which Tapoco and Nantahala are parties, Tapoco is entitled to 1.44 billion kilowatt-hours per year of the entitlement power, and Nantahala is entitled to the remaining 0.36 billion kilowatt-hours per year. The AA therefore allocates 80% of the entitlement power to Tapoco and 20% of the entitlement power to Nantahala. The AA was filed with FERC in 1980 as an appendix to a proposed wholesale rate schedule filed with FERC. *Id.*, at 61,275.

Under a Purchase Agreement to which TVA and Nantahala are parties, Nantahala may purchase additional power from the TVA grid. This "purchased power" is generated in part by nonhydroelectric plants, which is generally a more expensive way to produce electricity than the hydroelectric generation used to produce the entitlement power. As a result, purchased power is about three times as expensive to generate as is entitlement power. Tapoco does not itself purchase additional power from TVA, although Alcoa purchases some high-cost power directly from TVA and uses some of Tapoco's equipment to obtain that power.

Tapoco's only customer is an Alcoa plant in Alcoa, Tennessee, while Nantahala serves various wholesale and retail customers in North Carolina. Tapoco's sales to Alcoa and Nantahala's sales to its wholesale customers are governed by FERC-filed rates, while Nantahala's rates to its retail customers are set by NCUC.

### B

In 1976, Nantahala filed a proposed wholesale rate increase with FERC, which has exclusive jurisdiction over interstate wholesale power rates. 16 U. S. C. § 824(b). See also §§ 824d, 824e. FERC is to determine a "just and reasonable" rate for such power, § 824d(a), and Congress has speci-

fied various procedures for, and limitations on, the filing of such proposed and approved rates, §§ 824d(c), (d), (e).

In 1978, the town of Highlands (Highlands), a wholesale customer of Nantahala, filed a complaint with FERC. See § 824e(a). This complaint alleged that Alcoa, Tapoco, and Nantahala had violated the Federal Power Act by diverting, to Alcoa's private use, hydroelectric power and facilities dedicated to the public service. The Attorney General of North Carolina intervened in support of Highlands' position on behalf of Nantahala's customers. Because both the proceedings concerning the proposed wholesale rate increase and the proceedings concerning the Highlands complaint eventually involved allegations that Nantahala's costs had been unreasonably increased by misuse of the corporate form, FERC consolidated the two proceedings and resolved them in an opinion issued in May 1982. 19 FERC ¶ 61,152.

Highlands asked FERC to treat the commonly owned Tapoco and Nantahala as a single entity for ratemaking purposes, and to "roll in" their separate costs into the same rate base:

> "Highlands contends that because Nantahala and Tapoco have commingled their assets and liabilities under the NFA, it is not possible to derive a rational method of apportioning costs and benefits on any basis other than a rolled-in cost of service. The town asks [FERC] to pierce the corporate veil between the two utilities and treat them as one entity for ratemaking purposes, to set aside the [AA], to develop Nantahala's rates on a rolled-in cost of service basis, and to order Alcoa and Tapoco to establish an interconnection with Highlands." *Id.*, at 61,275.

FERC acknowledged that corporate entities may be disregarded when used to subvert clear legislative intent. See *Schenley Distillers Corp.* v. *United States*, 326 U. S. 432, 437 (1946) *(per curiam)*. See also *General Telephone Co.* v. *United States*, 449 F. 2d 846, 855 (CA5 1971). Nonetheless,

FERC declined to pierce the corporate veil. The particular history of Tapoco and Nantahala, as well as their current separation of customers and management, led FERC to conclude that it could not "find that Alcoa has used the separate corporate identities of Nantahala and Tapoco to frustrate the purposes of the Federal Power Act, or that the two companies operate as an integrated system." 19 FERC, at 61,277.

FERC concluded that the NFA was "the result of arms' length bargaining." *Id.*, at 61,278. FERC found that the AA, in contrast, was unfair to Nantahala. In the AA, Nantahala relinquished certain benefits it had received under an earlier agreement apportioning the entitlement power, but apparently obtained no compensation for that relinquishment. FERC concluded that "the most equitable division of entitlements would give Nantahala that portion of the NFA entitlements which is proportionate to the utility's actual contribution of power turned over to TVA." This portion was 22.5% in FERC's estimation, rather than the 20% of the entitlements power allocated to Nantahala by the AA. *Id.*, at 61,280. FERC stated that its decision did not "reform" the AA, but would "provide entitlements to Nantahala which will result in just and reasonable rates to its wholesale customers." *Ibid.* FERC therefore required Nantahala to file revised rates in accordance with its decision, and to refund any excess amounts collected.

In September 1982, FERC denied rehearing on its May opinion. Nantahala attempted to introduce new evidence that FERC's decision should take fuller account of differences in the kind of power best suited to Nantahala and Tapoco. (Nantahala serves residential customers and therefore needs a continuous, predictable power supply. Tapoco's industrial customer—Alcoa—requires a certain minimum amount of power at a given time to operate its facilities efficiently, but can periodically cease operations if sufficient power is not available.) FERC refused to consider Nantahala's new submission of evidence:

"In determining just and reasonable rates . . . , [FERC] did not choose to reform the [AA] and was not concerned with the mechanics of how entitlements of energy from TVA are allocated to each party, as long as each party receives its fair share of energy based on that party's contribution of actual energy turned over to TVA. . . . Our concern is that each party receive its proper entitlement. Nantahala entered into a[n] [AA] which we find unfair. As a result, the company had to make purchases from TVA which otherwise would not have had to be made. Nantahala must bear the consequences of its acts and refund rates collected to recover the cost of the excess purchases." *Nantahala Power & Light Co.*, 20 FERC ¶ 61,430, p. 61,871 (1982).

FERC's decision was upheld on appeal to the United States Court of Appeals for the Fourth Circuit. *Nantahala Power & Light Co.* v. *FERC*, 727 F. 2d 1342, 1348 (1984).

FERC's decision has a direct bearing on this case, but the decision before us is an opinion of the North Carolina Supreme Court that affirmed a NCUC order. That order resulted from Nantahala's request to raise its intrastate retail rates, over which NCUC has exclusive jurisdiction. The Attorney General of North Carolina intervened on behalf of Nantahala's retail customers. Some of Nantahala's wholesale customers also intervened.

In contrast to FERC, NCUC decided that Nantahala and Tapoco were a "single, integrated electric system," and that, "for purposes of setting Nantahala's rates in this proceeding, the Nantahala and Tapoco systems should be treated as one entity with respect to all matters affecting the determination of Nantahala's reasonable cost of service applicable to its North Carolina retail operations." App. to Juris. Statement 182a.

NCUC concluded that there were extensive "concealed benefits" to Tapoco from the AA and that "extensive injustice" to Nantahala thereby resulted. *Id.*, at 183a–197a.

Similarly, NCUC found a number of concealed benefits to Tapoco and injustices to Nantahala resulting from the NFA. NCUC concluded that it was therefore appropriate to "reject [Tapoco's and Nantahala's] proposed allocation methodology in that said methodology in all material respects is based upon the New Fontana Agreement and the Tapoco-Nantahala Apportionment Agreement." *Id.*, at 205a. See also *id.*, at 215a.

NCUC instead adopted the roll-in methodology proposed by the intervenors, which pooled various sources of power available to Tapoco and Nantahala and then allocated the pooled power according to demand. NCUC included in the pool all of the power generated by the Tapoco- or Nantahala-owned facilities operated by TVA, despite the fact that the NFA gave Tapoco and Nantahala the right only to the lesser amount of entitlements power. NCUC included Nantahala's purchased power in the pool, but excluded the power that Alcoa purchased directly from TVA. After accounting for assumed transmission and other losses, NCUC calculated the pool available to the Tapoco-Nantahala system to be 1.85 billion kilowatt-hours. *Id.*, at 220a.

NCUC then calculated Nantahala's demand (from both wholesale and retail customers) to be approximately 0.45 billion kilowatt-hours. Dividing Nantahala's demand of 0.45 billion kilowatt-hours by the 1.85 billion kilowatt-hours of supply available in the Tapoco-Nantahala pool produces a ratio of approximately 24.5%. NCUC used this ratio as Nantahala's share of the total costs of the Tapoco-Nantahala system. *Id.*, at 220a–221a.

NCUC did not differentially allocate costs from various sources of power to Tapoco and Nantahala. Approximately 24.5% of the cost of each source of power was therefore allocated to Nantahala, with approximately 75.5% remaining for Tapoco. Among the sources of power, of course, was the entitlements power. Under the NCUC order, therefore, Nantahala must calculate its costs for purposes of retail

ratemaking in North Carolina as if it received 24.5% of the entitlement power, though the FERC order requires it to calculate its costs for purposes of wholesale ratemaking as if it received 22.5% of the entitlement power. NCUC therefore not only expressly rejected the fairness of the NFA and the AA, but employed an allocation of entitlement power that nowhere takes into account FERC's allocation of that same power.

Appellants here challenged NCUC's allocation in the North Carolina courts. The North Carolina Court of Appeals and the North Carolina Supreme Court affirmed NCUC's decision. In an admirably thorough consideration of the myriad issues before it, the North Carolina Supreme Court concluded that NCUC had violated neither the Supremacy nor the Commerce Clause. *State ex rel. Utilities Comm'n* v. *Nantahala Power & Light Co.*, 313 N. C. 614, 332 S. E. 2d 397 (1985). It acknowledged that FERC has exclusive jurisdiction over interstate wholesale rates. *Id.*, at 686–687, 332 S. E. 2d, at 440. It concluded nonetheless that NCUC, in deciding to prevent Nantahala from recovering costs based on a failure to reach a fair NFA and AA, was "well within the field of exclusive state rate making authority engendered by the 'bright line' between state and federal regulatory jurisdiction under the Federal Power Act." *Id.*, at 687–688, 332 S. E. 2d, at 441. The North Carolina Supreme Court emphasized that NCUC had not expressly required Nantahala to disobey any order entered by FERC:

"[NCUC's] examination of the NFA and [AA] was not undertaken in an effort to either establish wholesale rates or to modify agreements filed with and approved by the FERC. In its order reducing rates [NCUC] expressly rejected the remedy of reforming these agreements to award Nantahala its just level of entitlements and nothing contained in [NCUC's] order purports to change or modify a single word of the several contracts

or agreements involved, or the actual flow of power thereunder." *Id.*, at 688, 332 S. E. 2d, at 440–441.

The North Carolina Supreme Court also stated that the utilities' statutory pre-emption arguments rested upon a misconception that FERC had found the NFA and AA to be fair and reasonable to Nantahala, when in fact FERC had ruled that the AA was unfair. *Id.*, at 693, 332 S. E. 2d, at 444. Finally, the court determined that NCUC's actions had not placed an excessive burden on interstate commerce. *Id.*, at 710–718, 332 S. E. 2d, at 454–458.

## II

### A

Appellants argue that the North Carolina Supreme Court's decision is inconsistent with the "filed rate" doctrine, which in pertinent part holds that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates. Appellants assert that NCUC's allocation of Tapoco's and Nantahala's entitlement power is inconsistent with FERC's allocation, and that the North Carolina Supreme Court's affirmance of NCUC's decision is therefore inconsistent with pre-emptive federal law.

As developed for purposes of the Federal Power Act, the "filed rate" doctrine has its genesis in *Montana-Dakota Utilities Co.* v. *Northwestern Public Service Co.*, 341 U. S. 246, 251–252 (1951). There, this Court examined the reach of ratemakings by FERC's predecessor, the Federal Power Commission (FPC). In *Montana-Dakota*, two power companies with interlocking directorates and joint corporate officers each received some of the other's power, at rates that the FPC had determined were reasonable. After separation of the two companies' management, one of the companies alleged that it had paid unreasonably high rates for the electricity that it had received and been paid unreasonably low rates for the electricity that it had provided. The complain-

ing company laid the blame for these allegedly fraudulent and unlawful rates at the door of the previously interlocking management, and brought suit in federal court.

This Court dismissed the claim. Emphasizing that Congress had given the FPC the right to determine the reasonableness of rates, the Court stated:

> "[The complaining company] cannot separate what Congress has joined together. It cannot litigate in a judicial forum its general right to a reasonable rate, ignoring the qualification that it shall be made specific only by exercise of the Commission's judgment, in which there is some considerable element of discretion. It can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms.

> "We hold that the right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the court can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one." *Id.*, at 251–252.

The existence of the interlocking management of the two utilities, and the resulting allegations of fraud, were irrelevant: "Perhaps, in the absence of the Commission's approval, such relationship would be sufficient to raise the presumption [of fraud] under state law, but it cannot do so where the federal supervising authority has expressly approved the arrangement." *Id.*, at 253.

This Court has held that the filed rate doctrine applies not only to the federal-court review at issue in *Montana-Dakota*, but also to decisions of state courts. In this application, the doctrine is not a rule of administrative law designed to ensure that federal courts respect the decisions of federal administrative agencies, but a matter of enforcing the Supremacy Clause. In *Arkansas Louisiana Gas Co.* v. *Hall*, 453 U. S.

571 (1981), for example, this Court overturned a state court's decision that, in calculating damages in a breach-of-contract suit, assumed that the FPC would have approved certain rates as reasonable and thus allowed the utility to charge that rate, although the rates were never in fact filed with the FPC:

> "[U]nder the filed rate doctrine, the [FPC] alone is empowered to make that judgment [of reasonableness], and until it has done so, no rate other than the one on file may be charged. . . . The court below, like the state court in [*Chicago & North Western Transp. Co.* v.] *Kalo Brick* [*& Tile Co.*, 450 U. S. 311 (1981)], has consequently usurped a function that Congress has assigned to a federal regulatory body. This the Supremacy Clause will not permit." *Id.*, at 581–582.

In *Chicago & North Western Transp. Co.* v. *Kalo Brick & Tile Co.*, 450 U. S. 311 (1981), the Court similarly noted that the filed rate doctrine as applied to the actions of the Interstate Commerce Commission assisted in the enforcement of the supremacy of federal law:

> "The common rationale of these cases is easily stated: '[T]here can be no divided authority over interstate commerce, and . . . the acts of Congress on that subject are supreme and exclusive.' *Missouri Pacific R. Co.* v. *Stroud*, 267 U. S. 404, 408 (1925). Consequently, state efforts to regulate commerce must fall when they conflict with or interfere with federal authority over the same activity." *Id.*, at 318–319.

See also *Maryland* v. *Louisiana*, 451 U. S. 725 (1981).

Even in contexts not directly addressed by *Arkansas Louisiana Gas*, *supra*, many state courts have applied the filed rate doctrine of *Montana-Dakota* to decisions of state utility commissions and state courts that concern matters addressed in FERC ratemakings. Some state courts have examined this interplay in determining the effect of FERC-approved

wholesale power rates on retail rates for electricity. See *Narragansett Electric Co.* v. *Burke,* 119 R. I. 559, 381 A. 2d 1358 (1977), cert. denied, 435 U. S. 972 (1978); *Eastern Edison Co.* v. *Department of Public Utilities,* 388 Mass. 292, 446 N. E. 2d 684 (1983). Others have examined the effect of FERC-approved wholesale rates for natural gas upon retail gas prices. See *Public Service Co. of Colorado* v. *Public Utilities Comm'n,* 644 P. 2d 933 (Colo. 1982); *United Gas Corp.* v. *Mississippi Public Service Comm'n,* 240 Miss. 405, 127 So. 2d 404 (1961); *City of Chicago* v. *Illinois Commerce Comm'n,* 13 Ill. 2d 607, 150 N. E. 2d 776 (1958); *Citizens Gas Users Assn.* v. *Public Utility Comm'n,* 165 Ohio St. 536, 138 N. E. 2d 383 (1956). In both contexts, these courts have concluded that a state utility commission setting retail prices must allow, as reasonable operating expenses, costs incurred as a result of paying a FERC-determined wholesale price:

> "[T]he Supreme Court has said that a reasonable rate is that rate filed with or fixed by the FPC. [Citing *Montana-Dakota,* 341 U. S. 246 (1951).] '[N]ot even a court can authorize commerce in the commodity on other terms.' *Id.,* at 251. . . . Thus the rate increase in the cost of electricity to Narragansett, filed and bonded by [the supplier], constitutes an actual operating expense and must be so viewed by the [state utility commission]." *Narragansett, supra,* at 566, 381 A. 2d, at 1362.

See *Eastern Edison, supra,* at 297–300, 446 N. E. 2d, at 687–689; *Public Service Co., supra,* at 938–940; *United Gas Corp., supra,* at 437–443, 127 So. 2d, at 418–420; *City of Chicago, supra,* at 615–616, 150 N. E. 2d, at 780–781; *Citizens Gas Users Assn., supra,* at 538, 138 N. E. 2d, at 384.

Many of these cases involved purchases by closely related entities, but these courts have uniformly concluded that FERC's regulation still pre-empted review by state utility commissions of FERC-approved rates. See *Narragansett, supra,* at 561, 567, 381 A. 2d, at 1359, 1362–1363 (retailer was wholly owned subsidiary of wholesaler); *Eastern Edison,*

*supra,* at 293, 446 N. E. 2d, at 685 (same); *United Gas Corp., supra,* at 437, 442, 127 So. 2d, at 418, 420 (same); *City of Chicago, supra,* at 609, 615–616, 150 N. E. 2d, at 777, 780–781 (retailer owned 100% of one wholesale supplier and 70% of another). These decisions are properly driven by the need to enforce the exclusive jurisdiction vested by Congress in FERC over the regulation of interstate wholesale utility rates:

> "[O]ur decisions have squarely rejected the view . . . that the scope of FPC jurisdiction over interstate sales of gas or electricity at wholesale is to be determined by a case-by-case analysis of the impact of state regulation upon the national interest. Rather, Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction, making unnecessary such case-by-case analysis. This was done in the Power Act by making FPC jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States." *FPC* v. *Southern California Edison Co.,* 376 U. S. 205, 215–216 (1964).

No such explicit exception by Congress has been alleged here. FERC clearly has exclusive jurisdiction over the rates to be charged Nantahala's interstate wholesale customers. See 16 U. S. C. § 824(b); *New England Power Co.* v. *New Hampshire,* 455 U. S. 331, 340 (1982). Once FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority.

Moreover, the filed rate doctrine is not limited to "rates" *per se:* "our inquiry is not at an end because the orders do not deal in terms of prices or volumes of purchases." *Northern Natural Gas Co.* v. *Kansas Corporation Comm'n,* 372 U. S.

84, 90–91 (1963). Here FERC's decision directly affects Nantahala's wholesale rates by determining the amount of low-cost power that it may obtain, and FERC required Nantahala's wholesale rate to be filed in accordance with that allocation. FERC's allocation of entitlement power is therefore presumptively entitled to more than the negligible weight given it by NCUC.

## B

The North Carolina Supreme Court was well aware that "state courts which have considered the question have uniformly agreed that a utility's costs based upon a FERC-filed rate must be treated as a reasonably incurred operating expense for the purposes of setting an appropriate retail rate." 313 N. C., at 692, 332 S. E. 2d, at 443. The North Carolina court did not reject the conclusions of those courts. Rather, it held that reliance on such cases was "misplaced" in light of the fact that the *Narragansett* line of cases has not held the filed rate doctrine "to preclude state authority to determine whether these costs should be automatically passed through to retail consumers in the form of higher rates." 313 N. C., at 693–694, 332 S. E. 2d, at 444. This interpretation of the *Narragansett* line of cases is at best an oversimplification, and in any event does not save NCUC's action from preemption.

In both *Narragansett, supra,* and *Public Service Co., supra,* the courts observed that an increase in FERC-approved wholesale rates need not lead to an increase in retail rates. Both decisions expressly stated, however, that such a divergence between wholesale and retail rates would occur only if costs *other than* those resulting from the purchases of FERC-regulated power or gas were to decrease. See *Narragansett,* 119 R. I., at 568, 381 A. 2d, at 1363 ("The commission . . . may treat the proposed rate increase as it treats other filings . . . and investigate the overall financial structure of [the power company] to determine whether the company has experienced savings *in other areas which might*

*offset the increased price*") (emphasis added); *Public Service Co.*, 644 P. 2d, at 941 ("[The commission] may treat the [increase] as it treats other filings for proposed rate increases . . . [and] investigate whether [either of the gas companies] has experienced *savings in other areas which might offset the increased price* for natural gas to consumers") (emphasis added).

This qualification is perfectly sensible. If, for example, the FERC-approved price of wholesale power rises slightly but a retailer's costs of transformation and transmission significantly decline, the retailer's overall costs might well decrease. A decrease in its retail rates might therefore be appropriate even though the cost of purchasing FERC-regulated power had increased. But in this case, there is no finding or indication that Nantahala's costs of obtaining purchased power have decreased, or that other costs of operation have declined dramatically. There is only NCUC's assertion that Nantahala should have obtained more of the low-cost, FERC-regulated power than Nantahala is in fact entitled to claim under FERC's order. Such a rationale runs directly counter to FERC's order, and therefore cannot withstand the pre-emptive force of FERC's decision.

The North Carolina court also stated that appellants' preemption argument "rest[s] upon the faulty premise that FERC deemed both the NFA and the [AA] to be fair and reasonable to Nantahala, when in fact it expressly ruled that the latter agreement was 'unfair' and refused to permit Nantahala to base its requested wholesale rate increase upon the costs incurred thereunder." 313 N. C., at 693, 332 S. E. 2d, at 444. While this description of FERC's decision is accurate as far as it goes, FERC did not merely determine that the NFA was a fair bargain and the AA an unfair one: FERC also set forth a new allocation of power to "provide entitlements to Nantahala which will result in just and reasonable rates." 19 FERC, at 61,280. Even though FERC later stated that it had not reformed the agreement itself, it did

require Nantahala to file new rates in accordance with the new, fair allocation of entitlement power between Tapoco and Nantahala. Indeed, FERC stated that "the [AA and an earlier apportionment agreement] clearly are contracts affecting, in some manner, rates and charges under Section 205(c) of the Federal Power Act, and should have been filed when made." *Id.*, at 61,280–61,281. FERC's allocation of entitlement power to Nantahala is therefore reflected in Nantahala's filed rates. NCUC cannot substitute its own conception of what allocation of entitlement power would have been memorialized in a fair AA simply because FERC did not approve the AA without qualification.

We acknowledge that this case does not present the typical application of the filed rate doctrine, in which a middleman faces a FERC-fixed wholesale rate charged by a power supplier. In that situation, for a state ratemaking agency to disregard a FERC-filed rate would clearly be inconsistent with the exclusive federal regulatory scheme over interstate wholesale power prices. The FERC-approved rate at which the middleman purchased power would not be fully recognized as a cost in the retail market, thereby forcing the middleman to sell power at less than its reasonable cost as determined by the federal agency.

Here, in contrast, Nantahala both owns some of the facilities that produce the relevant electricity and sells that power to its retail customers, rather than to a distributor. But FERC's regulation of wholesale power rates nonetheless has a direct effect on Nantahala's costs of producing retail power. Nantahala has, through the NFA, contracted with TVA for the latter to control 8 of Nantahala's 11 hydroelectric facilities, and that arrangement was approved by FERC in the course of rate proceedings over which FERC clearly had exclusive jurisdiction. FERC also examined the AA, a document filed in conjunction with the same proceeding, and concluded that the reasonable allocation of entitlement power was to give 77.5% of that power to Tapoco and 22.5% of that

power to Nantahala. From Nantahala's point of view, then, it is in a situation quite similar to that of a purchaser of wholesale power at FERC-approved rates: Nantahala is entitled to include only a certain, FERC-specified amount of low-cost entitlement power among the sources of power from which it can draw in providing retail power. The fact that NCUC is setting retail rates does not give it license to ignore the limitations that FERC has placed upon Nantahala's available sources of low-cost power.

The similarity between this case and the more typical application of the filed rate doctrine is apparent from the impermissible interference that enforcement of NCUC's order would create with the scheme of federal regulation. The filed rate doctrine ensures that sellers of wholesale power governed by FERC can recover the costs incurred by their payment of just and reasonable FERC-set rates. When FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate. See *supra*, at 964–966 (discussing *Narragansett* line of cases). Such a "trapping" of costs is prohibited. Here, Nantahala cannot fully recover its costs of purchasing at the FERC-approved rate if NCUC's order is allowed to stand.

Although the NFA and AA do not purport explicitly to set a sales price for power, FERC's decision on how Nantahala may treat these agreements in determining its wholesale rates obviously does affect Nantahala's costs directly, and thus Nantahala's wholesale rates. Entitlement power is cheap, and purchased power is dear. FERC has ordered Nantahala to set its wholesale rates in light of an allocation of 22.5% of the entitlement power given jointly to Tapoco and Nantahala by TVA (and thus to calculate its overall rates as if it needed to purchase the remainder of its power at purchased-power rates). NCUC, in contrast, has ordered

Nantahala to set its retail rates in light of an allocation of 24.5% of the entitlement power. Because purchased power is more expensive than entitlement power, NCUC's order prevents Nantahala from recovering the full costs of acquiring power under the FERC-approved scheme: Nantahala must under NCUC's order calculate its retail rates as if it received more entitlement power than it does under FERC's order, and as if it needed to procure less of the more expensive purchased power than under FERC's order. A portion of the costs incurred by Nantahala in procuring its power is therefore "trapped." Nantahala can obtain power from TVA only at a rate based on the relatively high cost of procuring power with a mere 22.5% of the low-cost entitlement power included in the mix; but under NCUC's order it can sell that power to retail customers only at a rate based on the relatively lower cost of procuring power with a 24.5% mix of cheap entitlement power.

We think FERC's failure actually to reform the AA does not materially alter this analysis. FERC ordered Nantahala to adjust its wholesale rates so that its average cost per unit of power reflected an allocation of entitlements power different from the allocation set forth in the AA. The effect of that order is, for purposes of this case, essentially the same as reformation of the agreement itself. FERC has determined that Nantahala's average cost of power obtained from TVA should be based on a particular allocation of entitlements power, and no other. By adopting a different allocation, NCUC imputes to Nantahala a different average cost of power, notwithstanding the fact that, under the AA, Nantahala unquestionably is not entitled to demand that TVA supply it with 24.5% of the entitlements power. Consequently, Nantahala is exposed to "trapped" costs. It must, under NCUC's order, pretend that it is paying less for the power it receives from TVA, under agreements not subject to NCUC's jurisdiction, than is in fact the case. Thus, NCUC's imposition of a different allocation of entitlements

power carries with it the same risk of "trapped" costs that underlies the *Narragansett* doctrine.

The validity of NCUC's decision to "roll in" the costs of Tapoco and Nantahala is not directly before us. We nonetheless agree with FERC, 20 FERC, at 61,869, that it is at least conceivable that NCUC could validly choose to treat Nantahala and Tapoco as a single system for some purposes—for example, with regard to the costs of constructing their facilities. But, in formulating rates over which it has exclusive jurisdiction, FERC ruled that the NFA and AA should be treated as allocating 22.5% of the entitlement power of the Tapoco-Nantahala system to Nantahala's customers and 77.5% of that power to Tapoco's customer. That allocation, reflected as it is in a filed rate, must be respected by NCUC. If, as a result; Nantahala needs to purchase additional power from some nonentitlement source, that need is a reasonable one.

Accordingly, the North Carolina Supreme Court erred in relying on cases treating the reasonableness of purchasing from a particular source of, rather than paying a particular rate for, FERC-approved power. See *Pike County Light & Power Co.* v. *Pennsylvania Public Utility Comm'n*, 77 Pa. Commw. 268, 273–274, 465 A. 2d 735, 737–738 (1983); *Kansas-Nebraska Natural Gas Co.* v. *State Corporation Comm'n*, 4 Kan. App. 2d 674, 679–680, 610 P. 2d 121, 127 (1980). Without deciding this issue, we may assume that a particular *quantity* of power procured by a utility from a particular source could be deemed unreasonably excessive if lower cost power is available elsewhere, even though the higher cost power actually purchased is obtained at a FERC-approved, and therefore reasonable, *price*. The North Carolina Supreme Court apparently felt that Nantahala procured an unreasonably large amount of purchased power in light of the availability of lower cost entitlement power. But Nantahala's procurement of purchased power is *not* unreasonably large given that Nantahala could not have treated it-

self as having access to any more low-cost entitlement power than it is eligible to include under FERC's interpretation of what would be a fair allocation. No source of power besides entitlement and purchased power from TVA is said to be available to Nantahala. Purchased power sells at a *higher* price than does entitlement power, and there is no allegation that Nantahala calculated its costs to include less of the low-cost entitlement power than the amount that FERC determined Nantahala was entitled to receive. The North Carolina court's ruling that Nantahala had purchased an unreasonably large quantity of high-cost power from TVA therefore conflicts with FERC's orders in the same manner as would a refusal to recognize a FERC-approved price as a reasonable cost for purposes of retail ratemaking. See *supra*, at 964–966.

Our disposition of the case makes it unnecessary for us to reach the appellants' arguments that NCUC's decision placed an undue burden on interstate commerce in violation of the Commerce Clause. For the reasons stated in this opinion, we reverse the judgment of the North Carolina Supreme Court and remand the case for further proceedings not inconsistent with this opinion.

*Reversed.*

JUSTICE POWELL and JUSTICE STEVENS took no part in the consideration or decision of this case.