PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, et al., Plaintiffs, Appellees, and Connecticut Valley Electric Company and Central Vermont Public Service Corporation, Plaintiffs/Intervenors, Appellees,

v.

Douglas L. PATCH, Chairman of the State of New Hampshire Public Utilities Commission, et al., Defendants, Appellants.

No. 98–1629.

United States Court of Appeals, First Circuit.

Dec. 3, 1998.

See also: 167 F.3d 15.

Dennis Lane with whom Michael E. Tucci and Morrison & Hecker, L.L.P. were on brief for defendants Douglas L. Patch, Bruce B. Ellsworth and Susan S. Geiger.

Sarah B. Knowlton, Steven V. Camerino and McLane, Graf, Raulerson & Middleton, P.A. on brief for City of Claremont, New Hampshire, Amicus Curiae.

Douglas W. Smith, General Counsel, John H. Conway, Deputy Solicitor, and Deborah B. Leahy on brief for Federal Energy Regulatory Commission, Amicus Curiae.

Philip T. McLaughlin, Attorney General, Martin P. Honigberg, Senior Assistant Attorney General, Civil Bureau, James K. Brown, John A. Shope and Foley, Hoag & Eliot LLP on brief for Jeanne Shaheen, Governor of the State of New Hampshire, Amicus Curiae.

F. Anne Ross and F. Anne Ross, P.C. on brief for Retail Merchants Association of New Hampshire, New Hampshire Office of the Consumer Advocate, Campaign for Ratepayers Rights, Community Action Program, City of Manchester and Cabletron Systems, Inc., Amici Curiae.

Lee A. Freeman, Jr., and Allan B. Taylor with whom John F. Kinney, James T. Malysiak, Glynna W. Freeman, Freeman, Freeman & Salzman, P.C., Joseph M. Kraus, Vice President and General Counsel, Central Vermont Public Service Corporation, Dom S. D'Ambruoso, John T. Alexander, Ransmeier & Spellman, John B. Nolan, Allan B. Taylor, Gary M. Becker, Robert W. Clark and Day, Berry & Howard were on brief for appellees Connecticut Valley Electric Company, Central Vermont Public Service Corporation, Public Service Company of New Hampshire, North Atlantic Energy Corporation, Northeast Utilities and Northeast Utilities Service Company.

* Of the Fifth Circuit, sitting by designation.

Before BOUDIN, Circuit Judge, BOWNES and REAVLEY,* Senior Circuit Judges.

BOUDIN, Circuit Judge.

On this appeal, we consider whether the district court properly enjoined a state utility commission to allow a specific increase in electric utility rates sought by Connecticut Valley Electric Service Company ("Connecticut Valley"). In timing and background facts, there is considerable overlap between this decision and our companion decision today in No. 98–1764, which arises out of the same district court proceeding. The reader's familiarity with that decision is assumed, but additional background is required to understand the events and legal issues peculiar to Connecticut Valley.

## I. BACKGROUND

Connecticut Valley is an electric utility that provides retail service to end-user customers in certain New Hampshire communities. Its rates are set forth in a retail tariff subject to the authority of the New Hampshire Public Utilities Commission ("the Commission"). R.S.A. § 378:7 (1997); *see Legislative Util. Consumers' Council v. Public Serv. Co.*, 119 N.H. 332, 402 A.2d 626, 631 (N.H.1979). The company does not generate any electric power; it is part of an integrated public utility system and purchases power from others.

About 76 percent of the power purchased by Connecticut Valley is acquired from its parent company, Central Vermont Public Service Company ("Central Vermont"). Rates and contracts for wholesale transactions in electric power, assuming an interstate nexus, are normally subject to regulation by the Federal Energy Regulatory Commission ("FERC") under the Federal Power Act, 16 U.S.C. §§ 824, 824d (1994). FERC has accepted for filing the tariffs and contract under which Central Vermont supplies power to Connecticut Valley. *See Appeal of Sinclair Mach. Prods., Inc.*, 126 N.H. 822, 498 A.2d 696, 698–99 (N.H.1985).

In supplying Connecticut Valley and its own retail customers in Vermont, Central Vermont purchases about 35 to 40 percent of its power under a long-term supply contract with Hydro Quebec. Contracts of this kind provide price and supply protection (the Hydro Quebec contract runs until 2016), but also commit the purchaser to buy even if market conditions change. Apparently, the Hydro Quebec contract price now exceeds wholesale electricity prices available in New England, so Connecticut Valley could lower its power costs in the short run if it ceased to buy from Central Vermont.

The existing contract between Connecticut Valley and Central Vermont permits Connecticut Valley to terminate its purchase contract on short notice; oversimplifying slightly, the notice period is one year. Although Connecticut Valley says that the Commission initially encouraged its contract with Central Vermont, the Commission has recently criticized the purchases, saying that the contract was being continued for the benefit of Central Vermont and that the purchases could be regarded as imprudent from Connecticut Valley's standpoint.

In February 1997, when adopting the Final Plan discussed in our companion decision, the Commission's implementing order as to Connecticut Valley addressed the issue directly. *See* Order No. 22,509. The Commission's order said that in calculating the costs that Connecticut Valley would be able to recover through its own retail rates, the Commission would disallow the cost of power acquired from Central Vermont to the extent that it exceeded the cost of power generally available at wholesale prices in Connecticut and in New Hampshire. *See id.*

Central Vermont responded in June 1997 by initiating a proceeding before FERC to terminate the contract with Connecticut Valley; the request for termination, however, was contingent on FERC's approval of a termination charge by which Central Vermont could effectively impose upon Connecti-

cut Valley a share of the "loss" resulting from the difference between the long-term Hydro Quebec rate and the lesser market rate now available. FERC rejected the Central Vermont proposal, but invited Central Vermont to return to FERC with a differently structured plan for making Connecticut Valley share in some measure in whatever loss resulted from termination.[1]

The next event leading to the present appeal occurred in Fall 1997, when Connecticut Valley submitted tariff changes to the Commission to secure an increase in Connecticut Valley's own retail rates. The purpose of the proposed increase, sought to be made effective on January 1, 1998, was simply to pass through to customers increases in Central Vermont's wholesale rate under its FERC tariff. It appears that the rate charged to Connecticut Valley depended on Central Vermont's own costs of generating and acquiring power, which vary from year to year. The Commission had previously allowed Connecticut Valley to make corresponding increases in its retail rates without much fuss or delay.

This time the story was different. The Commission announced on December 31, 1997, that it would not allow Connecticut Valley to increase its retail rates to take account of the increase in Central Vermont's wholesale rate charged to Connecticut Valley. *See* Order No. 22,815. The Commission's order acknowledged that this would cause a shortfall for Connecticut Valley, but it said that the utility should earlier have terminated its contract with Central Vermont. The Commission said it would later determine what prudently acquired wholesale power should cost Connecticut Valley, creating the threat of an actual decrease in Connecticut Valley's retail rates.

On January 19, 1998, Connecticut Valley and Central Vermont filed a motion in the district court in the pending litigation brought by Public Service Company of New Hampshire ("PSNH"), described in our com-

1. *See* Central Vermont Pub. Serv. Corp., Order Rejecting Standard Cost Amendment, 81 F.E.R.C. ¶ 61,336, 1997 WL 779009 (F.E.R.C.), at *1 (Dec. 18, 1997). Central Vermont filed a proposed exit fee with FERC in March 1998. *See* Central Vermont Pub. Serv. Corp., Order

Accepting for Filing and Suspending Proposed Exit Fee Provision, 82 F.E.R.C. ¶ 61,237, 1998 WL 111732 (F.E.R.C.), at *1 (Mar. 11, 1998). FERC accepted the proposal for filing and suspended the fee subject to a hearing which has not yet occurred. *See id.*

panion opinion. Connecticut Valley and Central Vermont, along with other utilities in New Hampshire, had already intervened in that case. *See Public Serv. Co. v. Patch,* 173 F.R.D. 17 (D.N.H.1997). In their motion, Connecticut Valley and Central Vermont sought a temporary restraining order and then a preliminary injunction to require the Commission to put into effect the rate increases that the Commission had disallowed in December 1997.

In the TRO motion, the two utilities argued that the Commission's rejection of the rate increases effectively violated the injunction against the Final Plan previously obtained by PSNH, and further argued that, independent of the district court's prior orders, the Commission's December 31, 1997, order was "preempted" by FERC's exclusive jurisdiction over the wholesale rate contract and over Central Vermont's pending application to modify the contract to impose an exit fee. The motion was also accompanied by affidavits of the two utilities' vice president and the companies' independent auditor attesting to the severe economic harm, including possible bankruptcy of Connecticut Valley, threatened by the Commission's action.

On January 20, 1998, the Commission granted rehearing in the rate proceeding and allowed Connecticut Valley to file additional testimony, but the Commission did not authorize the retail rate increases sought by the utility. In February 1998, the Commission filed papers in the district court opposing the TRO and disputing jurisdiction, the merits, and the predictions of irreparable injury. Further materials were filed by Connecticut Valley and Central Vermont, and on April 3, 1998, the district court held a hearing on the request for a TRO and preliminary injunction.

At the hearing, there were extensive arguments and counsel brought the district court up to date as to intervening developments. The court then took a brief recess and returned to make extensive oral rulings, generally favorable to Connecticut Valley and Central Vermont. Describing the Commission's conduct as a violation of the court's earlier grant of injunctive relief against the Final

Plan, the court directed counsel for the utilities to prepare a preliminary injunction.

On April 9, 1997, the district court entered a formal preliminary injunction adopting its oral rulings as findings of fact and conclusions of law. The injunction specifically directed the Commission to allow Connecticut Valley to recover through retail rates the full cost of wholesale power obtained from Central Vermont pursuant to the latter's FERC tariffs. It appears that since that time— possibly retroactively to January 1, 1998— Connecticut Valley has been obtaining the increased rates that it sought in its Fall 1997 filing.

The Commission has now appealed from the April 9, 1998, injunction. Its appeal raises threshold objections to the grant of the injunction, it denies that the utilities are likely to prevail on the merits, and it treats very briefly the issue of irreparable injury. We consider the arguments in the same order. The familiar requirements for a preliminary injunction and the standards for appellate review are set forth in our companion decision.

## II. DISCUSSION

■ At the threshold, the strictest limit on the district court's jurisdiction is the Johnson Act, 28 U.S.C. § 1342 (1994). This statute, described more fully in our companion decision, prohibits district court injunctions against state rate orders under certain circumstances. But one of the circumstances in which the Johnson Act does not bar injunction against a state rate order is where the order is found to be inconsistent with a federal statute or federal agency determination. *See* 28 U.S.C. § 1342(1); *New Orleans Pub. Serv., Inc. v. City of New Orleans,* 782 F.2d 1236, 1242 (5th Cir.1986), *modified in part,* 798 F.2d 858, *cert. denied,* 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987); *see also Aluminum Co. of America v. Utilities Comm'n,* 713 F.2d 1024, 1028 (4th Cir.1983).

Connecticut Valley is making just such a FERC preemption argument in this case. Such a claim is not barred by the Johnson Act. *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d

490 (1983); *New Orleans Pub. Serv.*, 782 F.2d at 1242. This is also true of Connecticut Valley's other claim on the merits—that the district court's earlier injunction against the Final Plan required the Commission to allow the increase; although we have found no case in point, it is unlikely that Congress intended that enforcement of a federal court injunction be barred by the Johnson Act.

■ The Commission's other threshold arguments are no more persuasive. Even if the modified Final Plan were itself too inchoate to make "ripe" a request to enjoin it—and we hold otherwise in our companion decision—the Commission's action in rejecting the Connecticut Valley rate increase is a formal agency rate action that has an immediate effect. *See generally Abbott Labs. v. Gardner*, 387 U.S. 136, 149–51, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Of course, the possibility that it might be corrected by the Commission itself or by a state court might raise exhaustion concerns; but those are not very powerful in the face of a claim that the rejection violates FERC authority, and that it is going to cause immediate irreparable injury to the utility. *Cf. Bowen v. City of New York*, 476 U.S. 467, 483–84, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986); *Mathews v. Eldridge*, 424 U.S. 319, 330–31, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

■ The Commission also argues inventively that its December 31, 1997, order is akin to the so-called suspension orders by which federal agencies, under statutes authorizing this step, temporarily delay ("suspend") a carrier or utility increase rate while investigating it. *E.g.*, 16 U.S.C. § 824d(e). As a matter of federal administrative law, a refusal by the regulatory agency to suspend rates under these statutes is usually (but not always) deemed unreviewable because the order is an interim measure and the shipper or customer is usually made whole automatically if the rate increase is ultimately found unjustified.[2]

The present situation is in no way akin to these cases. Although the Commission's December 31, 1997, order did suspend the tariffs, it also made a formal determination to disallow the increase on the ground that it was imprudent for Connecticut Valley to continue its contract. *See* Order No. 22,815. This disallowance was *final* and is not akin to a mere suspension; the further investigation contemplated by the Commission's order was directed not to possible approval of the increase but to the possibility that a *further* reduction might be ordered.

■ In its last threshold objection, the Commission asserts that the district court erred in considering the utilities' request as a "related" case to be heard by the same judge considering the original action brought by PSNH. It is sufficient to say that the two matters involve a substantial overlap, amply qualifying for consolidation under the terms of Local Rule 42.1(a) & (c) of the New Hampshire District Court. This is so even though we ultimately conclude that the December 31, 1997, order is not to be treated as an implementation of the Final Plan.

■ We turn now to the merits, or, more precisely, the requirement that the party seeking injunctive relief show that it is likely to prevail on the merits. *See Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir.1996). The first ground urged by the utilities in their brief is that the April 9, 1998, injunction is justified as an extension of the earlier injunctive relief secured by the PSNH against the Final Plan. The district court itself, at the April 3, 1998, hearing, described the Commission's December 31, 1997, order as an "end run" around the earlier injunction.

It is true that the Commission discussed the imprudence of the Connecticut Valley–Central Vermont contract in its order implementing the Final Plan; and both the De-

---

2. *See United States v. SCRAP*, 412 U.S. 669, 690–92, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Arrow Transp. Co. v. Southern R. Co.*, 372 U.S. 658, 667, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); *see also Cities of Carlisle and Neola, Iowa v. FERC*, 704 F.2d 1259, 1262–63 (D.C.Cir.1983) (rehard after FERC order became final, 741 F.2d 429). It is

far from clear that the same doctrine automatically prohibits the carrier or utility from seeking review of an order that *does* suspend its rate increase tariff, although the agency's broad discretion in imposing this time-limited suspension would ordinarily defeat judicial review.

cember 31, 1997, order and the Final Plan reflect a common desire to hold down customer rates. Nevertheless, the disallowance of the specific increase does not purport to rest on the Final Plan and is expressed as an exercise of conventional cost-based rate regulation—whether or not a lawful exercise is another matter. Thus, the injunction of April 9, 1997, requiring the rate increase, cannot be defended as enforcing the earlier injunction against the Final Plan.

■ What would support a preliminary injunction requiring the rate increase is a determination that the December 31, 1997, order would itself likely be found to violate the Federal Power Act or otherwise would contravene FERC's authority. The two utilities have argued forcefully that the December 31, 1997, order does violate federal law in two respects: by disregarding FERC's authority to determine what is a just and reasonable wholesale rate and by interfering with FERC's authority to impose a termination charge on Connecticut Valley.

The first of these two FERC-preemption arguments is expressed by the two utilities as a claim that the Commission has "violated the filed-rate doctrine" in its December 31, 1997, order rejecting the rate increase. The "filed rate" locution is commonly used in the case law (and in more than one way), but it is merely a shorthand as likely to confuse as to assist analysis.[3] Indeed, the label is somewhat misleading, since the doctrine on which the utilities here rely is not limited to rates.

Rather, the Supreme Court has ruled that where the FERC has lawfully determined a rate, allocation, or other matter, a state commission cannot take action that contradicts that federal determination. And even without explicit federal approval of a rate, the Court has treated a rate reflected in a FERC tariff as setting a rate level binding on a state commission in regulating the costs of the purchasing utility. *See Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 373–74, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 962–66, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986); *cf. Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251–52, 71 S.Ct. 692, 95 L.Ed. 912 (1951).

The difficulty for Connecticut Valley is that the Commission did not disallow its retail rate increase on the ground that the wholesale rates charged by Central Vermont were unjust or unreasonable. Rather, the Commission found that it is imprudent for Connecticut Valley to continue purchasing from Central Vermont since lower cost sources of energy are allegedly available—even if Central Vermont's wholesale rate might be just and reasonable in the conventional (regulatory) sense that that rate merely covers Central Vermont's own acquisition costs.

The Supreme Court has never squarely decided the question of whether imprudence is an escape hatch from the Commission's otherwise existing obligation to respect FERC's authority to determine the just and reasonable rate. But the Court has twice said that it would assume *arguendo* that such escape hatch existed; the Third Circuit has so held; and FERC has concurred, citing prior cases of its own. *See Mississippi Power & Light*, 487 U.S. at 373–74, 108 S.Ct. 2428; *Nantahala Power & Light*, 476 U.S. at 972, 106 S.Ct. 2349; *Kentucky W. Va. Gas Co. v. Pennsylvania Pub. Util. Comm'n*, 837 F.2d 600, 609 (3d Cir.1988); *Palisades Generating Co.*, 48 FERC ¶ 61,144, at 61,574 and n. 10, 1989 WL 262105 (1989). We agree with FERC.[4]

---

**3.** The phrase initially referred to the proposition that a shipper was bound to pay the tariff rate on file with the agency regardless of private understandings with the carrier, unless and until that rate was found to be unlawful. *See, e.g., Lowden v. Simonds–Shields–Lonsdale Grain Co.*, 306 U.S. 516, 520–21, 59 S.Ct. 612, 83 L.Ed. 953 (1939); *Pennsylvania R. Co. v. International Coal Co.*, 230 U.S. 184, 196–97, 33 S.Ct. 893, 57 L.Ed. 1446 (1913). Only later was the phrase used by the Supreme Court, as it is used here by the utilities,

to explain preemption of attempted state regulation.

**4.** In an amicus brief filed in this case, FERC in substance repeated the position that it took in an earlier order in Central Vermont Pub. Serv. Corp., Order Accepting Filing and Granting Request for Clarification, 84 F.E.R.C. ¶ 61,194, 1998 WL 765497 (F.E.R.C.), at *1 (Aug. 21, 1998), where it said: "We also clarify that the Commission's approval of the RS–2 rate sched-

Connecticut Valley says that the present situation is different because it is *required* to purchase from Central Vermont under a contract filed with FERC itself. It is arguable that the Commission could not disregard a long-term commitment by Connecticut Valley if FERC had blessed a contract that contained such a commitment, *cf. Mississippi Power & Light,* 487 U.S. at 373–74, 108 S.Ct. 2428; *Nantahala Power & Light,* 476 U.S. at 972, 106 S.Ct. 2349; but here the contract filed with FERC itself contains a provision allowing Connecticut Valley to extract itself on one year's notice.

■ In the district court, the utilities made an alternative argument for preemption, namely, that Central Vermont is seeking to impose some kind of an exit fee in proceedings before FERC, and the Commission's action in this case is trespassing on FERC's authority to impose such a fee. As noted, FERC has in fact indicated that it may entertain such a proposal, *see* 82 F.E.R.C. at ¶ 61,237, at 1998 WL 111732 (F.E.R.C.), at *1, and no doubt termination without an exit fee could leave Central Vermont customers to bear the full brunt of the higher cost power. But nothing in the state commission's December 31, 1997, order precludes FERC from imposing such a fee.

In sum, Connecticut Valley and Central Vermont have not shown likelihood of success on the merits, or even of fair ground for further litigation, in claiming that the December 31, 1997, order violates federal law insofar as it disallows the increase sought. That disallowance is the only issue on appeal in this case; if reductions of Connecticut Valley rates below existing levels are ordered, it will be time enough to consider whether they are precluded by the district court's injunction against the Final Plan or on other grounds.

If taken at face value, the claims of irreparable injury made by Connecticut Valley and Central Vermont are serious. The Commis-

sion's brief merely argues that Connecticut Valley had alternative means of relief—to appeal the Commission's orders to the state supreme court and to collect the higher rate pending appeal, subject to the filing of a bond. The utilities say that these options will not work. In all events irreparable injury is not itself a basis for injunction, absent some claim likely to succeed on the merits in the federal court action.

If we have misapprehended Connecticut Valley's arguments on the merits, it is free to petition for reconsideration; and a timely petition for reconsideration will stay the mandate—and thus maintain the April 12, 1998, injunction in effect until the petition is disposed of. Fed. R.App. P. 41(a). However, if Connecticut Valley does face the kind of calamity it predicts, it would be wise to consider at once its alternative remedies at FERC or through discussion with the Commission.

Accordingly, the April 12, 1998, injunction is *vacated.* The Commission is entitled, once the mandate becomes effective, to require Connecticut Valley to reduce rates back to the level prevailing on December 31, 1997.

*It is so ordered.*

---

ule does not preclude the Public Utilities Commission of the State of New Hampshire (New Hampshire Commission) from determining whether Connecticut Valley acted imprudently by not terminating the rate schedule under its terms where lower-priced power was available to Con-

necticut Valley. In making this clarification, the Commission takes no position on whether Connecticut Valley had available other power supply choices, or whether Connecticut Valley acted imprudently."