506 So.2d 978 (1987)
STATE of Mississippi, ex rel. Edwin Lloyd PITTMAN, Attorney General, et al.
v.
MISSISSIPPI PUBLIC SERVICE COMMISSION, et al.
No. 56762.
Supreme Court of Mississippi.
February 25, 1987.
Rehearing Denied May 20, 1987.
*979 Edwin Lloyd Pittman, Atty. Gen. by Frank Spencer, Asst. Atty. Gen., and W. Glenn Watts, Sp. Asst. Atty. Gen., John L. Maxey-Cupit & Maxey, Jackson, Lewis Burke, Vicksburg, Alice E. Powers, McComb, Everett T. Sanders, Natchez, for State.
James K. Child, Jr., Henderson S. Hall, Jr., F. Hall Bailey, Barbara Childs Wallace, & Mark Caraway-Wise, Carter, Child & Caraway, Jackson, J.P. Coleman-Coleman & Coleman, Ackerman, Robert H. Harper, Richard W. Wise, Bennett E. Smith, Dennis Miller, Jackson, for appellees.
EN BANC.
DAN M. LEE, Justice, for the Court:
This is an appeal from an order issued by the Mississippi Public Service Commission (MPSC) on September 16, 1985, in which Mississippi Power & Light Company (MP & L) was granted the largest rate increase it has ever requested, based on the costs associated with the Grand Gulf I Nuclear Power Plant (Grand Gulf). In granting the increase, on September 16, 1985, the MPSC found that MP & L had a revenue deficiency of and granted an additional increase of $326,547,000.00, despite the fact that it had granted MP & L an increase of $44,671,544.00 in June, 1985. Collection of the $326,587,000.00 increase was ordered over a ten year period.
The Mississippi Attorney General and the Mississippi Legal Services Coalition (MLSC) have appealed, assigning as error:
1) The adoption of retail rates to pay Grand Gulf expenses without first determining that the expenses were prudently incurred;
2) Substantive ex parte communications between the MPSC and other parties to this cause;
3) The ultra vires act of the MPSC in adopting prospective rates to go into effect in the future without regard to whether they will then be just, reasonable, and nondiscriminatory;
4) The failure to join Middle South Utilities and Middle South Energy, Inc. as parties to this cause;
5) The adoption of rates without substantial evidence to support the utilization of a projected test year;
6) MP & L's estoppel from seeking reimbursement of expenses greater than that originally represented to the MPSC when the Certificate of Need was issued;
7) Intervention of resident security holders;
8) Failure of the MPSC to follow procedural orders in conducting the rate hearing;
9) Adopting rates without substantial evidence of need; and
10) Allowing rates to reflect Grand Gulf costs that are not just and reasonable.
We find that Assignments 1, 4 and 7 have merit. Because MP & L and its sister and parent companies have used the jurisdictional relationship between state and federal regulatory agencies to completely evade a prudency review of Grand Gulf costs by either agency, we reverse and remand this case to the MPSC for further proceedings.

THE FACTS
Middle South Utilities, Inc. (MSU) consists of four operating companies (companies that actually generate electricity) and two service companies. The operating companies are: Arkansas Power & Light Company (AP & L), Louisiana Power & Light Company (LP & L), Mississippi Power & Light Company (MP & L), and New Orleans Public Service, Inc. (NOPSI). The service companies are: Middle South Services, Inc. (MSS), which provides technical and professional services to the operating companies, and Middle South Energy, Inc. *980 (MSEI), formed in 1973 to finance the Grand Gulf project. In July, 1986, after the hearings before the MPSC in this case, MSEI changed its name to System Energy Resources, Inc. (SERI).
The operating companies all issue common, (the only voting) stock, preferred (non voting) stock, and bonds. All of the common stock of each operating company, however, is held by MSU. The Chief Executive Officer of MSU, by voting the common stock of each operating company, is solely empowered to elect all of the directors for each operating company, and these directors then elect the officers of their companies. One important function of the Chief Executive Officers of the operating companies is to sit on the Operating Committee, which makes major system-wide decisions. Thus, the Operating Committee's decisions are made by officers all of whom are completely under the control of the Chief Executive Officer of MSU.
The MSU subsidiaries operate as an integrated system. Although the companies generally own power plants, they pool their generated electricity. This electricity is coordinated among the operating companies in response to their needs. A dispatching facility in Pine Bluff, Arkansas, allocates the energy produced by all of the companies, with each company meeting its needs first with the lowest cost energy that it can produce. If a company needs more energy than it can produce, it is allocated higher cost energy from the other operating companies. When the entire system produces more energy than it can use, the excess energy may be sold off the system.
In addition to sharing energy, the operating companies also share in the cost of energy-producing capacity. The method of allocating the cost of capacity has changed, by agreement of the operating companies, since the construction of Grand Gulf was authorized by the MPSC in 1974, and this change is one of the primary issues of this litigation.
In 1973, MSU and its subsidiaries reached an agreement which equalized the ownership costs of generating capacity throughout the MSU system. In that agreement, companies owning capacity in excess of that required to meet their needs were referred to as "long" companies. Companies requiring additional capacity to meet their needs were referred to as "short" companies. Under the concept of equalization, short companies had to share in the costs of the generating units owned by the long companies. The short companies' allocation was calculated on the basis of the costs of the long companies' most recently installed generating units, called "participation units."
When the 1973 System Agreement became effective, MSU was planning the Grand Gulf Nuclear Station. The original plan was to build one nuclear plant at the Grand Gulf site, under the management and control of MP & L, and one plant in Louisiana, under the control of NOPSI. However, the NOPSI site proved unsuitable, and MP & L, alone, could not finance a nuclear generating plant; therefore, MSEI (now SERI) was formed to provide financing for two nuclear generating plants at Grand Gulf.
In 1974, the MPSC issued its "Order Granting Certificate of Public Convenience and Necessity" authorizing the construction of Grand Gulf. MSEI, the actual owner of the proposed two-unit facility, joined MP & L as a petitioner. The Order reflected the understanding of all of the parties involved that the 1973 Agreement would be amended to include MSEI as a party.
We cannot stress enough the implications of this agreement embodied in the 1974 Order. MSEI is not an operating company; therefore, it does not require any generating capacity for itself. Under the 1973 Agreement, it would always be a long company, with excess capacity to allocate among the short companies. Grand Gulf, its most recently installed generating unit, would become MSEI's participation unit, from which the costs to the short companies would be calculated.
At the time that the Certificate of Need was granted, it was projected that Mississippi's demand for power would increase to *981 the point where MP & L would utilize about 38% of Grand Gulf. That demand has not materialized, and MP & L remains a long company. Under the 1973 Agreement, it would not be required to share in the allocation of costs of Grand Gulf unless and until it required additional capacity to meet its needs. Even if the increased consumption had materialized however, and MP & L had become a short company, it would have had to pay costs associated with Grand Gulf only to the extent that it required additional capacity.
In the later 1970's, MSU management began to have concern about the 1973 Agreement. Since the demand forecasts showed that MP & L and AP & L were long companies, and would remain so for some time, they would not need to purchase capacity until the planned nuclear plants had been greatly depreciated. Thus, they would not be required to bear the brunt of the costs of nuclear construction, as would the short companies. MSU's Operating Committee, consisting of the Chief Executive Officers of AP & L, LP & L, MP & L and NOPSI, studied the situation for several years, and, in 1980, voted to adopt a new system agreement.
The new agreement, referred to throughout these proceedings as the 1982 System Agreement, eliminated the participation unit concept. Instead, the companies were to implement the use of "intermediate Generating Units," defined as oil and gas burning units, to allocate the cost of capacity. The rationale for the change was as follows: Nuclear units, with their high fixed costs and low fuel costs, are run around the clock to provide the operating companies with base capacity. Oil and gas units, with their low fixed costs and high fuel costs, are primarily operated to provide reserve capacity: for instance, on hot summer days. Thus, excess capacity is more likely to have come from the operation of oil and gas burning, rather than nuclear, generating units. The effect of this change was that capacity allocated to companies in the MSU system was calculated on the cost of the generating oil and gas units, at a fraction of the cost of nuclear energy.
MSEI had no oil and gas burning units and was not a party to the 1982 System Agreement. It required however, a methodology for the allocation of the cost of the nuclear capacity at Grand Gulf. To that end, MSEI entered into a Unit Power Sales Agreement (UPSA) with the operating companies. The UPSA allocated Grand Gulf 1 among the operating companies as follows:

 LP & L 38.57%
 MP & L 31.63%
 NOPSI 29.80%
 AP & L 0.00%

The UPSA was not filed with the MPSC. However, it was filed with the Federal Energy Regulatory Commission (FERC) in Docket No. ER82-616-000. The 1982 System Agreement was filed with the FERC in Docket No. ER82-483-000.
At about the same time that they agreed on the UPSA, the MSU operating companies and MSEI entered into a Power Purchase Advance Payment Agreement. This agreement provided that the companies would pay MSEI in advance for Grand Gulf power. The payments, which totalled $12,500,000.00 per month for all of the companies, were to be made from January, 1984, through December, 1985, or whenever Grand Gulf became operational. Eighteen payments were made under this agreement; MP & L paid 33% of the total. The agreement provided that on the date that Grand Gulf became operational, and for eleven months thereafter, the companies would be reimbursed for 4% of the outstanding balance of the advances. The companies would get 8 2/3% for the next six months, and then the balance. MP & L's share of the agreement may be calculated as follows:
 $12,500,000.00/month X 18 months =
 $225,000,000.00 (the total amount of payments)
 $225,000,000.00 X 33% = $74,250,000.00
 (MP & L's share of the total payments)
 $74,250,000.00 X 4% = $2,970,000.00
 (first reimbursement to MP & L)
The last figure would be adjusted upward for interest accrued on the funds advanced *982 to MSEI. The actual rebate to MP & L on its first Grand Gulf bill was $3,232,727.41.
In 1984, FERC Administrative Law Judge Liebman issued his opinion in ER82-616-000, which dealt with the UPSA filing. He found the Grand Gulf allocation under the UPSA to be unjust and unreasonable, as was the proposal made by the MPSC to return to the 1973 Agreement and make Grand Gulf a participation unit. In order to allocate the costs of nuclear power throughout the MSU system, he ordered the following allocation for Grand Gulf 1:

 LP & L 14%
 MP & L 33%
 NOPSI 17%
 AP & L 36%

On February 4, 1985, FERC ALJ Head issued his order in ER82-483-000, which dealt with the 1982 System Agreement filing. He ruled that Grand Gulf was an anomaly in the MSU system that should be allocated among the operating companies, with the allocation fluctuating from year to year, based on each company's demand for system energy. The effect of that decision would be to allocate approximately 14 1/2% of Grand Gulf to MP & L.
In November, 1984, when the operational status of Grand Gulf became imminent, MP & L filed for the rate increase which is the subject of this case. In addition to the Grand Gulf expense, MP & L sought a rate increase for the purchase of part of the Independent Steam Electric Station Unit 2 (ISES2), a coal-burning plant located in Arkansas. MP & L bought 25% of the ownership, and 31.5% of the capacity of the plant, which was owned by a sister company, AP & L. It is agreed by all of the parties to this appeal that this purchase will result in lower fuel costs, which will be passed on to consumers through the fuel adjustment clauses in their bills. A rate hearing was held on January 15, 1985, for interim rates for the ISES2 purchase, and, on January 17, the MPSC issued an interim order granting approximately $45 million in increased revenues associated with ISES2. This order is not at issue in this appeal, except to the extent that it adds to the excess capacity imposed upon MP & L by the Grand Gulf allocation.
The primary objection to the allocation of Grand Gulf to MP & L is that Mississippi ratepayers simply do not need the energy generated by the plant. In fact, we cannot utilize this excess capacity until the mid-1990's, if ever. Frank Gallagher, an MP & L witness, testified that with the addition of ISES2 but before the Grand Gulf allocation, MP & L had a reserve capacity of 85% over peak demand. Both Gallagher and Lewis Perl, another MP & L witness, testified that the appropriate reserve margin was 30-35%. MP & L represented to the MPSC that the reserve capacity figures are unimportant, because the ratepayers only support the capacity that MP & L cannot sell off the system. Nevertheless, should MP & L be unable to peddle its excess energy to other companies, (which is the case now) Mississippi ratepayers would have to support over 100% more capacity than they can use.
On March 5, 1985, the MPSC issued an order severing the issue of prudency from the rate increase "to be heard at a later date." On April 30, the MPSC, the Attorney General, the MLSC and MP & L entered into a stipulation regarding the revenue requirements associated with the requested rate increase as to issues only. This stipulation specifically excluded the issues of prudency and excess capacity, because it had been severed by commission order on March 3, 1985.
The MPSC held another hearing on May 21, 1985. At that time, Grand Gulf 1 was expected to (and ultimately did) come on line July 1, 1985, at a kilowatt hour cost roughly equivalent to $72-85/barrel for oil. The company testified that the first bill from MSEI for Grand Gulf was expected on August 5, 1985, and, without a rate increase, MP & L could only afford to make the payment to MSEI through November. After that, MP & L would have to curtail activities or attempt to raise the money through an equity offering. The issue of bankruptcy was discussed, and later rejected, as an alternative.
*983 MP & L proposed a plan where revenues for the Grand Gulf expense would be recovered over a ten-year period. This plan was drawn in accordance with the UPSA allocation of Grand Gulf of 31.63%, although MP & L testified that its litigation position before the FERC was aligned with Judge Head's allocation of 14 1/4%. The "rate moderation plan" would allow MP & L to bill its customers at less than the Grand Gulf cost for its first five operational years, and recover the difference in the next five years. The theory behind the plan was to allow MP & L to defer part of the cost of Grand Gulf that would normally have to be recognized on its financial statements as expense. This deferral would allow the statements to reflect acceptable earning levels, so that the company could issue stocks and bonds to finance the difference. The rate moderation plan was drawn in accordance with MP & L's understanding of the requirements of Financial Accounting Standards Board (FASB) Statement No. 71, pertaining to the deferral of utility costs. (We note, in passing, that the ten-year plan is derived from a proposed amendment to FASB No. 71, and some accounting professionals have taken the position that such deferrals should be spread over the life of the plant. In this case, the revenues could be collected over the life of Grand Gulf, which is estimated to be forty years.) The plan proposed by MP & L also included provisions for low use customers and senior citizens, and provided for an annual "true up" of expenses.
On June 13, 1985, the FERC issued Opinion 234, affirming Judge Liebman's Grand Gulf allocation of 33% to MP & L, and rejecting Judge Head's allocation of 14 1/2%. This opinion was eventually affirmed by a 2-1 vote of the Court of Appeals for the District of Columbia Circuit. Mississippi Industries v. Federal Energy Regulatory Commission, 808 F.2d 1525 (D.C. 1987). Justice Bork dissented from the majority opinion, and would have held that FERC's allocation did not appear to remedy the alleged undue discrimination among the generating costs of nuclear energy of the operating companies.
On June 14, 1985, the MPSC granted a rate increase to MP & L for the ISES2 costs of $44,671,544.00. However, in allowing the increase, the Commission stated:
The matter of excess capacity on the Company's system and the Middle South System as a whole continues to be of great concern to this Commission. While the interim rate relief granted in this order attributable to additional capacity is represented by Independence Unit 2, this Commission expressly reserves all its rights to examine and investigate indepth [sic] the excess reserve or excess capacity issue in further proceedings in this cause, and take such action in granting permanent relief as may be appropriate. [emphasis added]
On the issue of Grand Gulf relief, however, the Commission held that MP & L had failed to meet its burden of proof. Specifically, the MPSC found that MP & L's change in allocating Grand Gulf expense precluded it from seeking the increased rates. The Commission stated that, as the state regulatory agency, it should be entitled to rely on the company's prior representations. Thus, the requested rate increase for Grand Gulf was denied.
After this order was issued, the parties engaged in settlement negotiations. Presented in these discussions was a proposal that MP & L currently recognize 22% of its 33% Grand Gulf allocation, while deferring the remaining 11%. No agreement could be reached. Eventually, the MPSC granted a rehearing on the Grand Gulf rate relief which it had denied on June 14, 1985.
On July 1, 1985, Grand Gulf Unit 1 came on line, causing MP & L to begin incurring unrecovered costs of about $906,000.00 per day. On July 26, MP & L applied for temporary emergency rates, claiming that the Grand Gulf bill would cause its net income to become negative in September. The first bill for Grand Gulf, of approximately $27 million, was sent to MP & L on August 7.
The MPSC held a hearing on the temporary rate increase on August 12, 1985. Company witnesses testified that MP & L's *984 deteriorating financial position had caused its bond ratings to be lowered below investment grade. However, the company had not, at that time, cancelled any preferred dividends.
On August 22, 1985, pursuant to an agreement between the MPSC and the federal court, the matter was set for a rehearing. By that time, MP & L's cash situation had declined precipitously, due to the unexpected cancellation of lines of credit with local banks. At the rehearing on September 9, the company testified that it had no external sources of financing.
The MPSC issued its Final Order on September 16, 1985, granting the $326 million rate increase. The order provided for recovery of Grand Gulf costs in a plan similar to the rate moderation plan originally proposed by MP & L. For the first 10 years of the plan, MP & L would inventory 1/3 of its 33% Grand Gulf allocation, with recovery of the deferred amount beginning in 1995. Of the 22% then allowed, 7.5% would be inventoried for the first three years. The net effect of the plan is illustrated by the following table:

 FERC 10-Year Current 3-Year Net Current
Year Allocation Inventory Recovery Inventory Recovery
1 33% - 11% = 22% - 7.5% = 14.5%
2 33 - 11 = 22 - 7.5 = 14.5
3 33 - 11 = 22 - 7.5 = 14.5
4 33 - 11 = 22 22.0
5 33 - 11 = 22 recovery 22.0+
6 33 - 11 = 22 of 22.0+
7 33 - 11 = 22 7.5% 22.0+
8 33 - 11 = 22 over 22.0+
9 33 - 11 = 22 years 22.0+
10 33 - 11 = 22 5-10 22.0+
11 Recovery of 11% over life of plant.

The amount allowed as "Net Current Recovery" would be further reduced in the first three years pursuant to a phase-in schedule. The order also provided that MP & L could recover currently the incremental cost (e.g., interest on bonds) of financing the deferred inventory amounts. The ultimate cost to the consumer is as follows:

 Annual Cumulative Increase
 Year Increase Ordered Over 1984 Rates
1985-86 14.07% 14.07%
1986-87 8-10% 22-24%
1987-88 8-10% 30-34%
1988-89 7-8 % 37-42%
1989-90 7-8 % 44-50%

I. PRUDENCY
Miss. Code Ann. § 77-3-39 (1972) authorizes the MPSC to establish just and reasonable rates which lead to a fair rate of return for the utility. As we have often held, "A fair rate is one which, under prudent and economical management, is just and reasonable to both the public and the utility." Miss. Public Service Commission v. Miss. Power Co., 429 So.2d 883 (Miss. 1983), (citing Southern Bell Tel. & Tel. Co. v. Mississippi Public Service Comm'n, 237 Miss. 157, 241, 113 So.2d 622, 656 (1959) [emphasis added]).
What appears to have taken place here is the evasion by sister MSU companies of any review of the prudency of their operation or the fairness of their many "in house" dealings. The C.O.N. to construct Grand Gulf was granted under a specific set of circumstances: the first unit was to be operational in 1980, the two units were to cost $1.227 billion, and Mississippi ratepayers were not to pay for any more of its capacity than they needed. Unit 1 began operation in July, 1985; the cost of Unit 1, alone, was over $3.5 billion; and the MSU-controlled operating companies agreed, among themselves that Mississippians should pay for 1/3 of its cost  much of Grand Gulf was even paid for in advance of receiving one kilowatt of power from the plant. Now MP & L presents us with this rate increase as a fait accompli, and demands that we affirm it, because the FERC has determined that a 33% allocation of Grand Gulf to MP & L does not discriminate among the various sister operating companies. We do not interpret the law to require that we approve the blind pass-through of a $326 million rate increase to Mississippians without a prudency review; to do so would be a gross abdication of the responsibility of state regulators.
Predictably, MP & L relies heavily on the decision of the United States Supreme Court in Nantahala Power & Light Co. v. Thornburg, ___ U.S. ___, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). In that case, the FERC had allocated a certain amount of low cost TVA-supplied hydroelectric power *985 to Nantahala Power & Light Company. The FERC allocation slightly adjusted an agreement between Nantahala and Tapoco, Inc., both wholly owned subsidiaries of Alcoa. Nantahala's retail customers were all North Carolina residents, and the North Carolina Utilities Commission (NCUC) rejected this allocation in its setting of rates for Nantahala. The NCUC set rates as if Nantahala were receiving more of the low cost power than it was allocated. Although the FERC allocation was ultimately approved by the United States Court of Appeals for the Fourth Circuit, the North Carolina Supreme Court affirmed the utility commission's action. The United States Supreme Court reversed.
The Supreme Court's opinion reiterated the exclusive jurisdiction of the FERC to set interstate wholesale rates. Since the allocation of low cost power directly affected Nantahala's rates, the Court held that "The fact that NCUC is setting retail rates does not give it license to ignore the limitations that FERC has placed upon Nanatahala's [sic] available sources of low-cost power." ___ U.S. at ___, 106 S.Ct. at 2358, 90 L.Ed.2d at 956.
We are aware of the effect that wholesale rates have on retail rates, and we do not challenge the FERC's jurisdiction over interstate wholesale rates. We do not, however, construe Nantahala as forcing the MPSC to set rates based on the construction and operation of a plant (nuclear or otherwise) that generates power that is not needed at a price that is not prudent. If MP & L had built Grand Gulf on its own, and then come to the MPSC asking for a rate increase based on its cost, no one would seriously argue that the commission would have the authority, indeed, the duty, to inquire into the prudency of its cost. MP & L, however, asks us to take the position that, because Grand Gulf is owned by an out-of-state corporation, the Supremacy clause of the United States Constitution precludes any such review of Grand Gulf, and forces its unneeded power down the throats of Mississippi ratepayers. We do not believe the preemption doctrine was ever intended to accomplish such an inequitable and unjust result.
Important factual distinctions exist between this case and Nantahala. In Nantahala, no question was raised about the prudency or necessity of acquiring low-cost hydroelectric power. The Supreme Court recognized this, stating:
Without deciding this issue, we may assume that a particular quantity of power procured by a utility from a particular source could be deemed unreasonably excessive if lower-cost power is available elsewhere, even though the higher-cost power actually purchased is obtained at a FERC-approved, and therefore reasonable, price.

___ U.S. at ___, 106 S.Ct. at 2360, 90 L.Ed.2d at 958.
In this case, there is no doubt that Mississippians do not need the power provided by Grand Gulf, and that lower cost power is available elsewhere (in fact, by plants owned by MP & L). The record indicates that MP & L still serves 61% of its electrical generating needs from oil and gas units, and, with the purchase of coal-generated energy from ISES2, the company is at 85% over peak demand. Furthermore, MP & L admitted at oral argument that it is selling the less expensive energy off the system and retaining the electricity allocated to it from Grand Gulf. The Grand Gulf electricity is estimated to have a busbar, or total generation, cost of 15¢ per kilowatt hour, compared to an average busbar cost of 4¢ for non-Grand Gulf power. Donald Lutken, the Chief Executive Officer of MP & L, testified that the company has the highest average kilowatt hour cost of the MSU system. In light of these facts, clearly the allocation of 33% of Grand Gulf power is unreasonably excessive. Since Mississippi cannot use 33% of Grand Gulf's power, the 1982 System Agreement providing for the allocation of 33% of its cost would seem to be imprudent.
The 1982 System Agreement is not the only action between MSU subsidiaries that gives us pause. The Power Purchase Advance Payment Agreement is another example of less-than-arm's-length transactions between these sister companies. We *986 can see no benefit accruing to MP & L by entering into the agreement to pay over $74 million to MSEI in advance of receiving any power from Grand Gulf. On the contrary, this agreement could only benefit MSU and MSEI by providing funds for construction work in progress at Grand Gulf, in circumvention of our long established doctrine preventing the use of funds to finance construction work in progress from being allowed in the rate base as a basis for increase for rates. Mississippi Public Service Commission v. Coast Waterworks, Inc., 437 So.2d 448 (Miss. 1983); State, ex rel., Allain v. Mississippi Public Service Commission, 435 So.2d 608 (Miss. 1983); Mississippi Public Service Commission v. Mississippi Power Company, 429 So.2d 883 (Miss. 1983). This agreement becomes especially suspect in light of the fact that it was entered among companies whose officers are controlled by MSU, the holder of all of their voting stock.
In sum, we believe that the relationship of MP & L to MSU, MSEI, and the other operating companies has brought about a situation in which Mississippi ratepayers are being intolerably burdened with highcost nuclear energy that they neither want nor need nor can afford.
In holding that a prudency review is not precluded by federal law, we adopt the following language from Appeal of Sinclair Machine Products, Inc., 126 N.H. 822, 498 A.2d 696 (1985):
The approach of this modern trend, which we here adopt and approve as being consistent with preemption doctrine applicable to State regulation of retail electric rates, is to examine whose matters actually determined, whether expressly or impliedly, by the FERC. As to those matters not resolved by the FERC, State regulation is not preempted provided that State regulation would not contradict or undermine FERC determinations and federal interests, or impose inconsistent obligations on the utility companies involved.
Id. 498 A.2d at 704.
Several aspects of prudency have never been addressed with respect to Grand Gulf, either by state or federal authorities. Specifically, we have yet to see MP & L, MSEI or MSU justify putting Grand Gulf on line at its exorbitant cost to ratepayers. At no point in the regulatory hearings related to Grand Gulf have we found evidence from MSU or its subsidiaries of alternatives to putting Grand Gulf on line. The FERC allocations presuppose an operational Grand Gulf, delivering at, or near, full capacity. That agency was never presented with the question of whether the completion of Grand Gulf, or its continued operation, was prudent. Mississippi Industries v. Federal Energy Regulatory Commission, 808 F.2d 1525 (D.C. Cir.1987) stated the issues reviewed by the FERC:
The principal issue in ER82-616 was whether the UPSA's proposed allocation of Grand Gulf investment costs was reasonable, and, if not, how such costs should be allocated... . The principal issue in the System Agreement proceeding was whether FERC should approve that Agreement as filed or whether it should equalize all of part of the production costs on the system.
Id., at pp. 1536-38.
Surely, it became obvious to MSU management, at least by the early 1980's, that both the cost and demand projections related to Grand Gulf were terribly incorrect. No regulatory review was made at that point, however, and management proceeded doggedly along. The Court of Appeals recognized this folly in its synopsis of the facts of this case:
The Grand Gulf project was initiated by MSU to meet the then projected demand for electricity by the system as a whole. 26 FERC at 65,101-12. By the late 1970's however, it became clear that projected demand would fall well short of previous expectations. Nonetheless, MSU continued to build Grand 1 on the assumption that the overall cost per kilowatt hour would be less than that of alternative energy sources. 26 FERC at 65,102.23
23 This assumption is now questionable. Through the 1990's Grand Gulf will not produce *987 energy that is cheaper than energy produced from alternative sources. Indeed, ALJ Liebman estimated that by 1993 ratepayers will pay $3 billion more for Grand Gulf energy than they would for energy from comparable sources. As of 1984 MSU was still predicting that Grand Gulf power would become economical at some future date and that at some (even later) point the project will represent a net benefit to consumers. 26 FERC at 65,103. As ALJ Liebman noted, however, the decline in the price of oil makes these projections appear rather dubious. Id.

Mississippi Industries, at 1535. However, the court made no finding with regard to prudency because the issue was not presented. Now that Grand Gulf is complete, at over three times its projected cost, and clearly unnecessary for the purpose of generating electricity for Mississippians, MP & L thinks that it can evade a prudency review of Grand Gulf because the plant is owned by an interstate wholesaler, which, incidentally, is wholly owned and controlled by MSU, as is MP & L. We disagree.
In remanding this case to the MPSC for a review of the prudency of the Grand Gulf investment, we rely on the expertise of this agency in making a determination of whether MSU and its subsidiaries made reasonable decisions in light of local conditions. We believe that this is a matter best left to this state agency to resolve, and that this issue has not been preempted by federal jurisdiction over interstate wholesale ratemaking. We, thus, agree with the following language of the Court of Appeals for the Fifth Circuit, applying the abstention doctrine of Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943):
Given the facts before us and the structure of the Federal Power Act, which leaves jurisdiction over retail rates to the states, we conclude that the district court did not abuse its discretion in finding Burford abstention appropriate here. As with the regulatory scheme at issue in Burford, the regulation and adjustment of local utility rates is of paramount local concern and a matter which demands local administrative expertise. The regulatory scheme is complex. In addition, the Louisiana state courts are fully able to address NOPSI's complaints about Council actions: appeals from Council orders are to be filed with the Civil District Court for the Parish of Orleans. Significantly, NOPSI has not denied that adequate state court remedies exist. That the state courts often capably address claims such as that raised by NOPSI is apparent from the number of state court cases upon which NOPSI relies to prove its preemption claim substantial. Nor would federal abstention foreclose the United States Supreme Court from entertaining NOPSI's preemption claim should it wind its way up through the state courts, as is demonstrated by the path of the recent Nantahala case.
New Orleans Public Service v. City of New Orleans, 798 F.2d 858, 862 (5th Cir.1986). See also Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission, 791 F.2d 1111 (3rd Cir.1986); Middle South Energy, Inc. v. Arkansas Public Service Commission, 772 F.2d 404 (8th Cir.1985).
We thus hold that the state regulatory body, in this case, the Mississippi Public Service Commission, must review the prudency of an investment such as Grand Gulf before it can enact rates based on its cost. Such a review must determine whether MP & L, MSEI and MSU acted reasonably when they constructed Grand Gulf 1, in light of the change in demand for electric power in this state and the sudden escalation of costs.

II. FAILURE TO JOIN MSEI AND MSU AS PARTIES
MSU, as the owner of all of the voting stock of its operating companies, obviously controls them, as well as MSEI. The evidence shows that MP & L entered into two contracts with its sister companies  the UPSA and the advance payment agreement  which were advantageous to its sister companies and detrimental to MP & L. The result of these agreements was the August Grand Gulf bill for approximately $27 million, presented to the MPSC as evidence of the emergency need for increased *988 rates. The substance of the bill was as follows:

 To bill you for cost of service for
 July, 1985 $30,092,473
 Less Purchase Power Advance
 Payment Credit 3,199,397
 ___________
 Net Payment 26,893,076
 ___________

The MPSC was acutely aware in this case that it was dealing with transactions that were not arm's-length, yet it accepted as evidence of the reasonableness and prudency of Grand Gulf costs this bare-bones invoice. This is directly contrary to the rationale of Western Distributing Co. v. PSC, 285 U.S. 119, 52 S.Ct. 283, 76 L.Ed. 655 (1931), which held that state authorities had the right, despite federal regulation, to inquire into transactions between a controlling corporation and its subsidiary:
The state authority whose powers are invoked to fix a reasonable rate is certainly entitled to be informed whether advantage has been taken of the situation to put an unreasonable burden upon the distributing company, and the mere fact that the charge is made for an interstate service does not constrain the Commission to desist from all inquiry as to fairness.
285 U.S. at 124-25, 52 S.Ct. at 284, 76 L.Ed. at 658. We do not read Nantahala to the contrary, although it cited with approval several cases involving purchases by closely related entities. The Court noted that "FERC's regulation still preempted review by state utility commissions of FERC approved rates." ___ U.S. at ___, 106 S.Ct. at 2356, 90 L.Ed. at 953-54. Neither the UPSA, which allocated more capacity to this state than it will be able to use until the mid-1990's, if ever, nor the Power Purchase Advance Payment Agreement, which was merely a conduit of construction financing from MP & L to MSEI, fall under the category of FERC approved rates. The MPSC had the authority, indeed, the duty, to inquire into the prudency of these suspect agreements.
Such a review could only be effective if MSU and MSEI (now SERI) were joined as parties. Motions were made for such a joinder and denied by the Commission. We hold that these parties should be joined in the prudency review to be accomplished on remand of this case, in order to accomplish a complete review of the transactions between MP & L, MSEI, and MSU, and their effect on Grand Gulf expense.

III. INTERVENTION OF MSU RESIDENT SECURITY HOLDERS
The only statutory basis for intervention in these proceedings is found in Miss. Code Ann. § 77-3-37(9), which allows intervenors and protestants to file direct testimony and exhibits with the MPSC. We believe that the intervention allowed in this case was error, for two reasons.
First, the security holders were already a party to these proceedings through the officers of MP & L. Shareholder intervention is improperly granted where there is no showing, as here, that the shareholders' interests are not being adequately represented. Brieterman v. Elmar Properties, Inc., 507 N.Y.S.2d 206 (N.Y.A.D.2d 1986); Lipton v. News Intern, PLC, 514 A.2d 1075 (Del.Supp. 1986).
Second, even under Rule 24(a)(2), Miss.R. Civ.P., intervention is only allowed under certain circumstances:
[W]hen the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties. [emphasis added]
See Guaranty National Insurance Co. v. Pittman, 501 So.2d 377, 381 (Miss. 1987). Here, the applicants' interest was obviously the preservation of their stock value through the award of a rate increase to MP & L. That interest was coexistent with MP & L's desire to enhance its financial position by obtaining a rate increase. Thus, the intervenors' interest was adequately represented by MP & L, a party to the action, and intervention of the resident security *989 holders was improper under the facts in this case.
We, thus, find reversible error in the proceedings below, and we reverse and remand this case to the Mississippi Public Service Commission for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and PRATHER, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
ROBERTSON, J., dissents.
ROBERTSON, Justice, dissenting:
I respectfully dissent. I am of the view that our decision this day is in an area wholly preempted by authority granted by the Congress to the Federal Energy Regulatory Commission. Nantahala Power & Light Co. v. Thornberg, 476 U.S. ___, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986); see also Transcontinental Gas Pipeline Corp. v. State Oil & Gas Board, 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986).