**PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, et al., Plaintiffs,**

**and**

**Connecticut Valley Electric Company and Central Vermont Public Service Corporation, et al., Plaintiffs/Interveners,**

**v.**

**Douglas L. PATCH, Bruce Ellsworth and Susan S. Geiger, Defendants.**

**Nos. 97–97–JD, 97–121–L.**

United States District Court, D. New Hampshire.

March 6, 2000.

Bruce W. Gladstone, Cameron & Mittleman, Providence, RI, Jeffrey S. Cohen, Sulloway, Hollis & Soden, Concord, NH, John B. Nolan, Day, Berry & Howard, Hartford, CT, James J. Tancredi, Day, Berry & Howard, Hartford, CT, Allan B. Taylor, Day, Berry & Howard, Hartford, CT, Martin L. Gross, Sulloway & Hollis, Concord, NH, for plaintiffs.

Robert Frank, NH Office of PUC, Concord, NH, Dennis Lane, Steven K. White, John E. McCaffrey, Michael E. Tucci, Morrison & Hecker, L.L.P., Washington, DC, Gary M. Epler, Larry S. Eckhaus, New Hampshire Public Utilities Commission, Concord, NH, for Douglas L. Patch, Chairman of the State of N.H. Public Utilities Commission, defendant.

Mark W. Dean, Dean, Rice & Howard, Manchester, NH, for New Hampshire Electric Cooperative, Inc., intervenor-defendant.

Paul K. Connolly, Jr., H. Glenn Alberich, Scott J. Mueller, Damian R. LaPlaca, LeBoeuf, Lamb, Leiby & MacRae, Boston, MA, Paul B. Dexter, Patricia French, LeBoeuf, Lamb, Greene & MacRae, Boston, MA, Jacqueline Killgore, Public Utility Policy Institute, Bedford, MA, for Unitil Corporation, intervenor-defendant.

Dem S. D'Ambruoso, Dom S. D'Ambruoso, Ransmeier & Spellman, Concord, NH, Dom S. D'Ambruose, Concord, NH, Joseph M Kraus, Rutland, VT, John T. Alexander, Ransmeier & Spellman, Concord, NH, Lee A. Freeman, Freeman, Freeman & Salzman, Chicago, IL, Carmen L. Gentile, David E. Goroff, James H. McGrew, Bruder, Gentile & Marcoux, Washington, DC, Glynna W. Freeman, James T. Malysiak, John F. Kinney, Freeman, Freeman & Salzman, Chicago, IL, for Connecticut Valley Electric Company, plaintiff.

## DECISION AND ORDER

LAGUEUX, District Judge.[*]

This matter is the latest installment in the extensive litigation resulting from New Hampshire's attempt to deregulate its electric utility industry.[1] However, for the reasons set forth below, the particular issue decided today is distinct from the many issues surrounding the implementation of that deregulation effort. Specifically, the question before the Court at present is whether Connecticut Valley Electric Company ("plaintiff") is entitled to a permanent injunction mandating the New Hampshire Public Utility Commission ("defendant") to pass through in plaintiff's retail rates the wholesale energy price paid by plaintiff to Central Vermont Public Service Corporation ("Central Vermont") while plaintiff is purchasing power from Central Vermont pursuant to a federally-approved contract and tariff. This Court concludes that plaintiff is entitled to such relief and a permanent injunction shall issue.

### I. *Background*

Plaintiff, a New Hampshire corporation, distributes and sells electric service to approximately 10,000 customers in western New Hampshire. Plaintiff purchases seventy-six percent (76%) of its power from its parent Central Vermont, a Vermont corporation, pursuant to an interstate cost-of-service-based wholesale requirements rate schedule ("RS–2 Rate Schedule") approved by the Federal Energy Regulatory Commission ("FERC"). This purchasing arrangement has been in place since 1950 and some form of the RS–2 Rate Schedule has been in existence since 1982. The RS–2 Rate Schedule contains the following clause ("Section E"):

> E. *Termination* Service under this rate schedule may be terminated at any time if both [Central Vermont] and [plaintiff] agree to the termination. If there is no agreement, service may be terminated at the end of a service year if the party seeking termination has given written notice of termination prior to the beginning of that service year.

As discussed below, the parties vigorously dispute the ramifications of this clause.

Plaintiff purchases the remainder of its power from other sources not relevant to the case at bar. Plaintiff's retail rates are set forth in a retail tariff which is subject to approval by defendant.

Approximately ninety percent (90%) of the power Central Vermont supplies to plaintiff is purchased from other sources,

---

[*] Of the District of Rhode Island, sitting by designation.

[1] See *Public Serv. Co. of N.H. v. Patch,* 962 F.Supp. 222 (D.N.H.1997) ("Patch I"); *Public Serv. Co. of N.H. v. Patch,* 173 F.R.D. 17 (D.N.H.1997) ("Patch II"); *Public Serv. Co. of N.H. v. Patch,* 136 F.3d 197 (1st Cir.1998) ("Patch III"); *Public Serv. Co. of N.H. v.* *Patch,* 167 F.3d 15 (1st Cir.1998) ("Patch IV"); *Public Serv. Co. of N.H. v. Patch,* 167 F.3d 29 (1st Cir.1998) ("Patch V"), cert. denied, —— U.S. ——, 119 S.Ct. 1458, 143 L.Ed.2d 544 (1999); *Public Serv. Co. of N.H. v. Patch,* 202 F.3d 29 (1st Cir.2000) ("Patch VI").

pursuant to several long-term contracts. One of those contracts is with Hydro Quebec. That arrangement was made on a long-term basis in 1990 so that Central Vermont and plaintiff would have a firm and reliable source of power to service their customers. That arrangement and the rates to be paid were approved by FERC, the Vermont Public Service Board and defendant as it was then constituted.

At all times relevant to this matter (because of the passage of time and change of power supply circumstances) these long-term contract prices have exceeded wholesale electricity prices in New England. Because Central Vermont essentially passes these prices through to plaintiff under the RS–2 Rate Schedule, plaintiff has been buying power from Central Vermont at higher-than-market wholesale rates.[2]

In 1996, with the purpose of reducing the state's retail electric rates, the New Hampshire legislature adopted the Electric Utility Restructuring Act, N.H.Rev. Stat.Ann. §§ 374–F:1 et seq. (1999) ("the Act"), providing for the introduction of competition into the New Hampshire electric utility industry. Pursuant to the power vested in it by this statute, defendant issued a restructuring plan (the "Final Plan") and implementing orders on February 28, 1997. See Order No. 22,514; Order Nos. 22,509–22,513 (specific utilities' interim stranded cost rulings). Familiarity with the Final Plan's details is assumed as it is described at length in Patch I and Patch IV. See Patch, 962 F.Supp. at 226–228; Patch, 167 F.3d at 18–19. Of importance here is defendant's February 28, 1997 order which denies plaintiff a stranded cost recovery charge for power purchased from Central Vermont to the extent that the cost of that power exceeds wholesale prices generally available in the New Hampshire market. See Order No. 22,509. ("Stranded Cost Recovery Order"). Defendant's rationale for this determination was that plaintiff should, pursuant to Section E, terminate the RS–2 Rate Schedule and avail itself of current market prices, thus avoiding any stranded costs upon the implementation of restructuring. See id.

On March 3, 1997, Public Service Company of New Hampshire ("PSCNH"), the largest electric utility in New Hampshire, brought suit in this Court, seeking to enjoin implementation of the Final Plan on a number of federal constitutional grounds. This Court granted a temporary restraining order ("TRO") against implementation of the Final Plan on March 10, 1997. On March 21, 1997, after an evidentiary hearing, this Court renewed the TRO and requested briefing on the issues of ripeness and abstention. In Patch I, issued April 28, 1997, this Court rejected those grounds for dismissal of this case, rejected defendant's claim that the Court lacked jurisdiction under the Johnson Act, 28 U.S.C. § 1342, and concluded that the TRO should remain in place until further order of the Court. See Patch, 962 F.Supp. at 244.

In Patch II, issued June 12, 1997, this Court allowed several other New Hampshire electric utilities to intervene in the litigation as of right. See Patch, 173 F.R.D. at 28. Shortly thereafter, on June 18, 1997, plaintiff and Central Vermont were permitted to intervene.

Fearful of the consequences if defendant ultimately prevailed in the litigation and forced plaintiff to terminate the RS–2 Rate Schedule, Central Vermont initiated a proceeding before FERC on June 25, 1997 to terminate the contract. Central Vermont proposed that, as a condition of termi-

**2.** It is to be noted that any New England electric utility that purchases power because of the lack of generation facilities of its own needs a firm and reliable source to meet its peak demands in December when all the Christmas lights are on and in July when all the air conditioners are running. It must pay a premium to have that committed reliability. Therefore it is somewhat misleading to compare those rates with wholesale rates for power available in the New England power pool during off-peak periods.

nation, it be allowed to amend its open access transmission tariff to add a stranded cost surcharge to its transmission rates when transmission was for ultimate delivery of power to plaintiff's service area. This surcharge would enable Central Vermont, upon termination of the RS–2 Rate Schedule, to recover the difference between the long-term contract rates and the lesser market rate at which it could then sell power. FERC rejected this proposal, but deferred notice of cancellation and invited Central Vermont to request an alternative loss-shifting method, namely, an amendment to the RS–2 Rate Schedule imposing an exit fee on plaintiff in the event of termination. *See Central Vermont Pub. Serv. Corp.*, 81 F.E.R.C. ¶ 61,336, 62,543 (1997), *available in* 1997 WL 779009. On December 27, 1997, Central Vermont made the suggested request and, on March 11, 1998, FERC accepted it for filing, suspended the fee provision and ordered a hearing, which has not yet occurred. *See Central Vermont Pub. Serv. Corp.*, 82 F.E.R.C. ¶¶ 61,237, 61,908 (1998), *available in* 1998 WL 111732. FERC also rejected Central Vermont's notice of contract cancellation, thus, the RS–2 Rate Schedule remains in effect to this day.

During this period, regulation of the electric utility industry continued as usual in New Hampshire. Consequently, in the fall of 1997, plaintiff submitted tariff changes to defendant to secure an increase in plaintiff's retail rates which would pass through to customers an increase in Central Vermont's wholesale rates under the RS–2 Rate Schedule. FERC approved the changes to the RS–2 Rate Schedule on January 13, 1998. Under such circumstances, defendant had previously approved retail rate increases. However, on December 31, 1997, defendant issued an order disallowing the increase, essentially freezing plaintiff's retail rates at the 1997 level. *See* Order No. 22,815. ("Disallowance Order"). Defendant's rationale for this action was that plaintiff had acted imprudently by not terminating the RS–2 Rate Schedule one year earlier under Sec-

tion E and thus was not entitled to pass through the elevated costs to consumers. *See id.*

On January 19, 1998, plaintiff and Central Vermont filed a motion in the pending litigation of which they were now a part, seeking a temporary restraining order and then a preliminary injunction to require defendant to allow the pass-throughs. The utilities put forth two alternative arguments: 1) that the Disallowance Order effectively violated the existing TRO against implementation of the Final Plan and 2) that the Disallowance Order was preempted by FERC's exclusive jurisdiction over the RS–2 Rate Schedule. On April 3, 1998, after a hearing, this Court issued a decision from the bench granting plaintiff's request for a preliminary injunction. The Court stated on the record that the March 21, 1997 TRO secured by PSCNH, prohibiting implementation of the Final Plan, applied to all New Hampshire utilities, including plaintiff, and that defendant's action was an "end run" around that injunction. The Court then opined that defendant's action was also vulnerable on both preemption and takings grounds. On April 9, 1998, this Court entered a formal preliminary injunction mandating defendant to allow the retail rate increase.

In the meantime, two further developments occurred in the case. The first was an appeal to the First Circuit by interested parties, other than New Hampshire electric utilities, whose intervention was denied in Patch II. *See Patch*, 173 F.R.D. at 29. In Patch III, issued February 3, 1998, the First Circuit affirmed the denial of those parties' motion to intervene. *See Patch*, 136 F.3d at 210. The second was defendant's receipt of petitions for reconsideration of the Final Plan. On March 20, 1998 defendant entered a new order, Order No. 22,875, modifying the Final Plan in various respects not relevant to the issue at hand. The modified Final Plan did not alter or displace the disallowance contained in the Stranded Cost Recovery Or-

der. Subsequently, PSCNH, along with the interveners, filed a further amended complaint in this Court alleging many of the original claims.

On June 5, 1998, this Court held a hearing to consider the effect of the March 20, 1998 order modifying the Final Plan. On June 12, 1998, this Court issued an order prohibiting defendant from requiring PSCNH, or any other intervener, to comply with the modified Final Plan.

Defendant appealed the issuance of both the April 9 and June 12 orders. In Patch IV, issued December 3, 1998, the First Circuit upheld the issuance of the order enjoining defendant from implementing the modified Final Plan as to any New Hampshire electric utility. *See Patch,* 167 F.3d at 28–29

However, in Patch V, a companion opinion issued the same day as Patch IV, the First Circuit vacated the preliminary injunction requiring defendant to allow the pass-throughs. *See Patch,* 167 F.3d at 36. The Court first concluded that, because the Disallowance Order was "an exercise of conventional cost-based rate regulation" not purporting to rest on the Final Plan, the April 9 injunction could not be defended as an enforcement of the injunction against the Final Plan's implementation. *Id.* at 35. The Court next considered whether an independent justification for the preliminary injunction existed; namely, whether plaintiff could prove a likelihood of success on the merits of its preemption claim. *See id.* For reasons discussed in more detail below, the First Circuit concluded that plaintiff could not, and thus vacated the April 9, 1998 preliminary injunction, leaving defendant free to roll back plaintiff's retail rates to 1997 levels. *See id.* at 35–36.

On January 19, 1999, plaintiff and Central Vermont filed the motion for summary judgment now before the Court. Plaintiff seeks a permanent injunction requiring defendant to allow a retail rate increase to pass through plaintiff's wholesale purchase costs, arguing again that the Disallowance

Order is preempted by federal law. In addition, despite the clear demarcation of the issues by the First Circuit in Patch V, plaintiff and Central Vermont also seek a permanent injunction prohibiting implementation of the Final Plan. The utilities argue that the Final Plan, including the Stranded Cost Recovery Order, violates the federal constitution on a variety of grounds, many similar to those raised in the original complaint by PSCNH. Defendant opposed the motion and filed a summary judgment motion of its own, seeking judgment against both parties on all grounds. On October 20, 1999, this Court heard oral arguments on these cross-motions for summary judgment.

In the meantime, however, another dispute between the parties arose. Upon dissolution of the April 9, 1998 preliminary injunction, defendant not only rolled back plaintiff's retail rates to the 1997 levels, but also ordered further temporary reductions to essentially refund to customers the higher amounts collected during the period that the preliminary injunction had been in effect. Plaintiff responded by asking this Court to enjoin defendant from ordering such further reductions until plaintiff's request for permanent relief was decided on the merits.

On May 11, 1999, after an April 7, 1999 hearing, this Court issued an order prohibiting defendant from further reducing plaintiff's retail rates below the 1997 level. Defendant appealed. In Patch VI, issued January 24, 2000, the First Circuit specified that defendant's "refund" order, like its Disallowance Order, was not an implementation of the Final Plan and thus not a violation of the June 12, 1998 preliminary injunction. *See Patch,* 202 F.3d at 33. The Court then stated that agencies like defendant "often require refunds of rates 'wrongly' collected. Unless the original . . . order disallowing [plaintiff's] increase is vulnerable to injunction by a federal court, it is hard to see what authority a federal court has to defer the [defendant]-

ordered refund. And, as we explained in Patch V ... [plaintiff] has not yet made such a showing of likely vulnerability as to the disallowance order." *Id.* at 34 (citation omitted). However, the Court concluded that "the district court may be on the verge of supplying the missing explanation in deciding the merits of the now-submitted cross-motions for summary judgment." *Id.* Consequently, the First Circuit remanded the matter to this Court, with instructions that this Court could defer vacation of the May 11, 1999 preliminary injunction for up to 90 days while the Court considered the merits of permanent relief.[3] *See id.* at 34. It will be unnecessary to issue that 90–day deferment order in view of the decision rendered today.

As the First Circuit predicted, the disallowance issue is now in order for decision. This Court will now supply the "missing explanation" for the grant of a permanent injunction requiring defendant to pass through plaintiff's wholesale purchase costs.

This Court will not, however, address the summary judgment arguments of plaintiff, Central Vermont and defendant as to the validity of the Final Plan as a whole or the validity of the Stranded Cost Recovery Order. The First Circuit clearly distinguished between the two issues and this Court will abide by those distinctions. Furthermore, the litigation between PSCNH and defendant has been stayed, as those parties are currently negotiating toward a settlement. The June 12, 1998 preliminary injunction maintains the status quo in the meantime. As PSCNH supplies about seventy percent (70%) of the retail electric power in New Hampshire, any settlement it reaches with defendant will like-

ly affect the situation of plaintiff and Central Vermont and may eliminate or at least modify the claims put forth in their summary judgment motion. Thus, this Court will stay that aspect of the litigation until negotiations between PSCNH and defendant are either abandoned or result in a resolution.[4]

Therefore, the sole issue addressed today is whether either party is entitled to summary judgment on plaintiff's request for a permanent injunction mandating defendant to allow the pass through rates. This Court concludes with ease that plaintiff is entitled to the relief it requests.

## II. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Thus, summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the nonmoving party. *See Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st

---

**3.** In *Patch VI*, the First Circuit also considered this Court's order denying defendant's January 18, 1999 motion to dissolve the June 12, 1998 preliminary injunction. The Court affirmed the denial of the motion. *See id.* at 32. Thus, the June 12, 1998 preliminary injunction, prohibiting implementation of the Final Plan, has been affirmed by the First Circuit on two separate occasions and remains in effect.

**4.** At the October 20, 1999 hearing, this Court also heard oral arguments regarding cross-motions for summary judgment filed by plaintiff/intervener Unitil Corporation and defendant. For the reasons just expressed, this Court will stay resolution of those motions while the PSCNH negotiations continue.

Cir.1991). When deciding cross-motions for summary judgment, the Court must consider each motion separately, drawing inferences against each movant in turn. *See Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996). Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. *See id.*

### III. *Discussion*

■ Despite its complicated history, the "missing explanation" for this portion of the case is really rather simple. As the First Circuit explicated in Patch V, an independent justification for a federal injunction requiring defendant to allow the pass-throughs would exist only if the disallowance is preempted by federal law. *See Patch,* 167 F.3d at 35.[5]

■ Plaintiff argues that the Disallowance Order is in fact preempted under the "filed-rate" doctrine, which essentially prevents a state commission from taking any action that alters a wholesale rate or power allocation lawfully set by FERC. *See Mississippi Power & Light Co. v. Mississippi ex rel. Moore,* 487 U.S. 354, 371–372, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 962–966, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). Thus, "[s]tates may not bar regulated utilities from passing through to retail consumers FERC-mandated wholesale rates." *Mississippi Power,* 487 U.S. at 372, 108 S.Ct. 2428. The doctrine is based on FERC's exclusive jurisdiction to determine the reasonableness of wholesale rates. *See id.* at 371, 108 S.Ct. 2428.

Defendant responds by arguing that the Disallowance Order was not based on a determination of the reasonableness of the rates, but on the imprudence of plaintiff's decision to continue to purchase power under the RS–2 Rate Schedule. Such a "prudence" determination, defendant argues, is within the jurisdiction of a state commission and not preempted under the filed-rate doctrine. *See id.* at 373, 108 S.Ct. 2428 ("[W]e may assume that a particular *quantity* of power procured by a utility from a particular source could be deemed unreasonably excessive if lower-cost power is available elsewhere, even though the higher-cost power actually purchased is obtained at a FERC-approved, and therefore reasonable, *price.*") (quoting *Nantahala,* 476 U.S. at 972, 106 S.Ct. 2349) (emphasis in *Nantahala* ). *See also Kentucky W.Va. Gas Co. v. Pennsylvania Pub. Util. Comm'n,* 837 F.2d 600, 609 (3rd Cir.1988), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988); *Palisades Generating Co.,* 48 F.E.R.C. ¶¶ 61,-144, 61,574 and n. 10 (1989), *available in* 1989 WL 262105.

Plaintiff responds by first arguing that there is no such imprudence exception to the filed-rate doctrine. Alternatively, plaintiff argues that the application of such an exception depends upon the utility's legal ability to purchase power from an alternative source. *See Mississippi Power,* 487 U.S. at 373–374, 108 S.Ct. 2428 ("it might well be unreasonable for a utility to purchase unnecessary quantities of high-cost power, even at FERC-approved rates, *if it had the legal right to refuse to buy that power* ") (emphasis added). *See also Nantahala,* 476 U.S. at 972–973, 106 S.Ct. 2349. Despite Section E, plaintiff claims that the RS–2 Rate Schedule establishes a long-term commitment that plaintiff is not legally empowered to terminate. In such a situation, plaintiff argues, the filed-rate doctrine applies to preempt any claimed "prudence" determination.

---

**5.** A finding of preemption, as opposed to a different constitutional violation, is necessary to avoid the limitations imposed by the Johnson Act, 28 U.S.C. § 1342 (1994). The Johnson Act prohibits federal injunctions against state rate orders under certain circumstances; however, it does not bar an injunction where the order is found to be inconsistent with a federal statute or agency determination. *See id. See also Patch,* 167 F.3d at 33 (citing authorities).

The First Circuit, upon considering these same arguments to determine the appropriateness of preliminary relief, agreed with defendant that an imprudence determination creates an "escape hatch" from the filed-rate doctrine. *See Patch,* 167 F.3d at 35. The Court then acknowledged that it was at least "arguable" that such an escape hatch was unavailable in the face of a long-term commitment blessed by FERC. *Id.* at 36. However, the Court concluded that because of the apparent one-year termination provision contained in Section E, defendant's decision that plaintiff had acted imprudently in not exercising its termination right was likely a proper exercise of its "prudence review" power and thus likely not preempted by FERC's jurisdiction over the RS–2 Rate Schedule. *See id.*

The parties now exhaust much time and effort arguing over the ramifications of Section E and the degree of deference that should be given to the First Circuit's statements regarding plaintiff's ability to terminate the RS–2 Rate Schedule under Section E.

▪ However, buried in the mass of paper submitted to this Court is an undisputed fact which moots these arguments and summarily blunts defendant's position as a matter of law. On July 22, 1998, defendant *rescinded* its previous directive to plaintiff, contained in the Stranded Cost Recovery Order, to terminate the RS–2 Rate Schedule. *See* Order No. 22,986. This action was obviously based on defendant's desire to avoid the potentially severe adverse consequence of the purchase contract's termination, namely, the imposition of an exit fee on plaintiff that defendant would be required to pass through to New Hampshire retail customers. *See id.*

Without knowledge of this fact, the First Circuit in Patch VI opined as to the consequences of such a situation: "[I]f Central Vermont prevails at … FERC … and is allowed to impose a termination charge on [plaintiff], [defendant] may be forced to retreat from its effort to compel the contract termination, thereby undermining its rationale for its disallowance order." *Patch,* 202 F.3d at 34. Clearly, defendant's complete turnaround of its position regarding the desirability of contract termination completely undermines its rationale for the Disallowance Order. Although the two orders were distinct, the Disallowance Order and the Stranded Cost Recovery Order were both based on the premise that contract termination in early 1997 was the desired course of action. The new order demonstrates that defendant no longer accepts this premise, and thus cannot sincerely claim that the Disallowance Order is based on an imprudence determination. However, defendant offers this Court no other rationale besides imprudence for its disallowance of the pass-throughs.

Thus, defendant is attempting to whipsaw plaintiff by assuming these polar positions. Plaintiff is prohibited from terminating the contract because defendant fears the imposition of an exit fee by FERC but yet cannot recover the wholesale rates it has to pay pursuant to that contract in its retail rates. No electric utility can long survive if its retail rates produce less revenue than it has to pay to purchase the power delivered to its retail customers.

In short, defendant cannot have it both ways. It cannot force plaintiff to live under the contract and disallow pass through of plaintiff's wholesale costs validly incurred pursuant to the RS–2 Rate Schedule. It is absolutely clear, therefore, that there is preemption under the filed-rate doctrine, because of FERC's exclusive jurisdiction over the RS–2 Rate Schedule. The provincial views of a state regulatory commission cannot be allowed to thwart federal energy policy as enunciated by FERC in giving approval to interstate and foreign contracts for the purchase of much needed electric power here in the North-

east.[6]

Therefore, so long as plaintiff continues purchasing power pursuant to the RS–2 Rate Schedule and said arrangement is not terminated with FERC's blessing, defendant must allow plaintiff to pass through its wholesale costs to its retail customers in New Hampshire.

## IV. *Conclusion*

For the preceding reasons, plaintiff's summary judgment motion is granted and defendant's summary judgment motion is denied. Plaintiff is entitled to a permanent injunction mandating that defendant allow plaintiff to pass through to its retail customers its wholesale costs incurred under the RS–2 Rate Schedule. Clearly, as a result of today's ruling, defendant cannot attempt to return to customers the amount of increased rates collected during the period that the April 9, 1998 preliminary injunction was in effect because those rates were properly collected. On the contrary, plaintiff now is entitled to recover the balance of those wholesale rates paid since January, 1997 not already recovered; thus, defendant is additionally mandated to temporarily allow an increment in the retail rates until such recovery is achieved.

Generally, pursuant to Federal Rule of Civil Procedure 54(b), final judgment is not entered until all claims in a case have been resolved. However, as the above discussion illustrates, the Disallowance Order issue decided today is wholly distinct from the remaining claims involving implementation of the Final Plan and the Stranded Cost Recovery Order. There is no telling how much time will elapse before those claims are finally resolved. Given these circumstances, this Court finds that there is "no just reason for delay" in finalizing the relief granted herein. Fed.R.Civ.P. 54(b). Plaintiff is entitled to immediate

relief. A judgment containing the permanent injunction delineated herein should be entered forthwith. The attorneys for plaintiff shall draft such a judgment and present it to the Court for entry.

It is so ordered.

---

**6.** One of the reasons that power costs are high in this little corner of the world is that there is no "cheap" hydro power available here. Conventional power plants with their attendant high costs must be built to "back- up" the hydro plants during the dry seasons. That situation may change dramatically if Canada succeeds in harnessing the highest tides in the world in the Minas Basin at the top of the Bay of Fundy.