# United States Court of Appeals
## For the First Circuit

No. 00-1460

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, ET AL.,

Plaintiffs,

and

CONNECTICUT VALLEY ELECTRIC COMPANY and
CENTRAL VERMONT PUBLIC SERVICE CORPORATION,

Plaintiffs, Appellees,

v.

DOUGLAS L. PATCH, CHAIRMAN OF THE STATE OF NEW HAMPSHIRE
PUBLIC UTILITIES COMMISSION, ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Ronald R. Lagueux,[*] U.S. District Judge]

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Boudin, Circuit Judge.

Gary Epler, General Counsel, New Hampshire Public Utilities

---

[*]Of the District of Rhode Island, sitting by designation.

Commission, with whom Michael E. Tucci, Steven K. White and Morrison & Hecker L.L.P. were on brief for defendants Douglas L. Patch, Susan S. Geiger and Nancy Brockway, Chairman and Commissioners of the State of New Hampshire Public Utilities Commission.

Philip T. McLaughlin, Attorney General, Stephen J. Judge, Associate Attorney General, Civil Bureau, James K. Brown, Kathleen O. Dias and Foley, Hoag & Eliot LLP on brief for Jeanne Shaheen, Governor of New Hampshire, Amicus Curiae.

Sarah B. Knowlton, Steven V. Camerino and McLane, Graf, Raulerson & Middleton, P.A. on joinder brief for City of Claremont, New Hampshire, Amicus Curiae.

Lee A. Freeman, Jr. with whom John F. Kinney, James T. Malysiak, Glynna W. Freeman, Freeman, Freeman & Salzman, P.C., Joseph M. Kraus, Senior Vice President and General Counsel, Central Vermont Public Service Corporation, Dom S. D'Ambruoso, John T. Alexander and Ransmeier & Spellman were on corrected brief for plaintiffs Central Vermont Public Service Corporation and Connecticut Valley Electric Company.

————————————

July 25, 2000

————————————

BOUDIN, Circuit Judge.  This appeal is the latest installment in a series growing out of New Hampshire's efforts to deregulate the electric utility industry and trim rates for customers.[1]  Familiarity with our prior decisions is assumed. We repeat here only those facts pertinent to the present issue.

Connecticut Valley Electric Company ("Connecticut Valley"), a small New Hampshire utility, provides retail electric service to about 10,000 customers in New Hampshire. Connecticut Valley purchases about 76 percent of its power from its parent company, Central Vermont Public Service Corporation ("Central Vermont"), a Vermont utility, under a wholesale requirements contract ("the RS-2 contract") that incorporates cost-of-service rates ("the RS-2 rate schedule") filed with and regulated by the Federal Energy Regulatory Commission ("FERC"). Connecticut Valley and Central Vermont have had a requirements contract incorporating some form of the RS-2 rate schedule since 1982.

---

[1]Public Serv. Co. v. Patch, 962 F. Supp. 222 (D.N.H. 1997) (Patch I); Public Serv. Co. v. Patch, 173 F.R.D. 17 (D.N.H. 1997) (Patch II); Public Serv. Co. v. Patch, 136 F.3d 197 (1st Cir. 1998) (Patch III); Public Serv. Co. v. Patch, 167 F.3d 15 (1st Cir. 1998) (Patch IV); Public Serv. Co. v. Patch, 167 F.3d 29 (1st Cir. 1998) (Patch V), cert. denied, 526 U.S. 1066 (1999); Public Serv. Co. v. Patch, 202 F.3d 29 (1st Cir. 2000) (Patch VI); Public Serv. Co. v. Patch, 87 F. Supp. 2d 57 (D.N.H. 2000) (Patch VII).

The RS-2 contract has a termination clause that, read literally, permits either party to terminate the contract at the end of a service year by giving written notice of termination before the beginning of that service year. See Patch V, 167 F.3d at 32. Connecticut Valley and Central Vermont contend that the termination clause was not intended to give either of them the ability to terminate unilaterally on such short notice, but the district court found it unnecessary to decide whether the one-year termination clause allows Connecticut Valley to terminate on the specified notice if and when its own interests so dictate.

Central Vermont's rates under the RS-2 contract with Connecticut Valley are higher than the current rates for wholesale electricity available elsewhere in New Hampshire, due in part to an expensive long-term contract by which Central Vermont purchases from Hydro Quebec. In February 1997, as part of its restructuring of electricity regulation in New Hampshire, the New Hampshire Public Utilities Commission ("the Commission") found that Connecticut Valley should have given notice of termination of its RS-2 contract on or before December 31, 1996. This finding was made in computing the so-called "stranded cost recovery charge" that Connecticut Valley would otherwise be allowed to recover from customers as part of the deregulation

-4-

process.  Re Connecticut Valley Elec. Co., Order No. 22,509 (Feb. 28, 1997) (the "Stranded Cost Recovery Order").[2]

Concerned that Connecticut Valley would terminate the RS-2 contract and thereby leave Central Vermont alone with a long-term obligation to buy expensive power from Hydro Quebec, Central Vermont in June 1997 filed with FERC its own proposal to terminate the RS-2 contract.  However, it made termination contingent on FERC allowing Central Vermont to add a "stranded cost surcharge" on power delivered over its transmission lines to customers in Connecticut Valley's service area.  FERC rejected that proposal as inconsistent with earlier FERC orders and regulations, but decided to allow Central Vermont to file a different plan that would impose an exit fee on Connecticut Valley at the contract's termination, and thus ensure that Connecticut Valley shared in the loss to Central Vermont that would result from termination of the contract.  See Central Vt. Pub. Serv. Corp., 81 F.E.R.C. ¶ 61,336, at 62,543 (1997), aff'd, --F.3d--, No. 98-1532, 2000 WL 762766 (D.C. Cir. June 30, 2000).

---

[2]"Stranded costs" is a loose concept referring, in the present context, primarily to investments that a utility made during the period of monopoly service which are jeopardized by deregulation--for example, by new obligations to allow the utility's lines to be used by other suppliers.  The restructuring and deregulation process in New Hampshire, including the statute and the Commission's evolving plan to implement it, are described in detail in Patch IV, 167 F.3d at 18-22.

In December 1997, Central Vermont notified FERC that it would seek a tariff amendment to establish an exit fee (to recover its own stranded costs). The recovery of stranded costs at the wholesale level is the subject of extensive FERC regulation, recently sustained in almost all respects by the D.C. Circuit in Transmission Access Policy Study Group v. FERC, --F.3d--, Nos. 97-1715 et al., 2000 WL 762706, at *24 (D.C. Cir. June 30, 2000). FERC accepted the proposed exit fee provision for filing in March 1998. See Central Vt. Pub. Serv. Corp., 82 F.E.R.C. ¶ 61,237, at 61,908 (1998). A hearing has now been held before an administrative law judge at FERC, but no decision on either the propriety or the amount of the fee has yet been issued.

In late December 1997, as the state's restructuring proceedings continued, Connecticut Valley applied for a routine increase in its 1998 retail rates to incorporate increases in Central Vermont's RS-2 rate schedule. Such adjustments to the RS-2 schedule are made periodically by Central Vermont to reflect changes in its cost of acquiring power, and, in the past, the Commission has allowed them to be passed through by Connecticut Valley to its own customers. FERC accepted Central Vermont's increased RS-2 rates for filing on January 13, 1998. This time, instead of approving the requested increase, the

state commission found Connecticut Valley imprudent for not terminating the RS-2 contract sooner because power was available for less money on the open market, and it disallowed the requested increase. <u>Connecticut Valley Elec. Co.</u>, Order No. 22,815 (Dec. 31, 1997) ("the Disallowance Order"). This finding paralleled the reasoning behind its Stranded Cost Recovery Order.

In the same period, litigation concerning New Hampshire's plan for restructuring the electric utility industry was proceeding in this court and the district court. In December 1998, we upheld a preliminary injunction in which the district court prohibited the Commission from implementing its broad deregulation plan. <u>Patch IV</u>, 167 F.3d at 28-29. However, in a companion decision, <u>Patch V</u>, we vacated the injunction to the extent it required the Commission to allow Connecticut Valley to recover through its retail rates the full cost of wholesale power purchased under the RS-2 contract. 167 F.3d at 36. We found that Connecticut Valley had not shown a likelihood that the Disallowance Order was enjoinable by a federal court under the restrictive terms of the Johnson Act, 28 U.S.C. § 1342 (1994).

Our decision in <u>Patch V</u> permitted the Commission to roll back Connecticut Valley's retail rates to the 1997 level.

However, after that decision, the Commission ordered Connecticut Valley to reduce its rates temporarily <u>below</u> the 1997 level in order to refund to customers the higher rates they had paid while the district court's preliminary injunction was in effect. <u>Connecticut Valley Elec. Co.</u>, Order No. 23,168 (Mar. 22, 1999) ("the Refund Order"). Connecticut Valley and Central Vermont objected to the district court regarding this further reduction; the district court agreed; and on April 7, 1999, it enjoined the Commission from ordering the refund. The Commission again appealed to this court.

In <u>Patch VI</u>, decided on January 24, 2000, we found that the injunction against the Refund Order could not be sustained on the basis thus far supplied, but allowed the district court 90 days to provide a sufficient basis for such an injunction. 202 F.3d at 34-35. The district court then sought to supply that explanation and, at the same time, to dispose of the parties' cross-motions for summary judgment as to the underlying dispute. On March 6, 2000, the district court concluded that Connecticut Valley and Central Vermont are entitled to a permanent injunction allowing Connecticut Valley to pass through to its retail customers the cost of wholesale power it purchases from Central Vermont under the RS-2 contract. <u>Patch VII</u>, 87 F. Supp. 2d at 65. The Commission now appeals.

The district court's summary judgment decision, which we review de novo, Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996), rested in major part on an order of the Commission issued on July 22, 1998, in which the Commission vacated a directive in its February 1997 Stranded Cost Recovery Order, Re Statewide Elec. Util. Restructuring Plan, Order No. 22,986 (July 22, 1998) ("the Vacation Order"). In particular, the Vacation Order canceled the Commission's prior directive instructing Connecticut Valley to terminate the RS-2 contract. Because the Commission no longer demanded that Connecticut Valley terminate its RS-2 Contract on the basis of its "imprudence," the district court ruled that federal law required the Commission to allow recovery of the federal tariff rate for purchases under that contract. Patch VII, 87 F. Supp. 2d at 64-65.

We begin our review with the main legal constraint that governs federal injunctions against state utility rates. Where such relief is sought, it is not enough for the utility to establish federal jurisdiction and a claim for relief on the merits; it must also show that the injunction comports with the Johnson Act, which allows such injunctions only under very limited conditions. One such condition is where the state rate order conflicts with a federal statute or a federal agency

-9-

action.  See Patch V, 167 F.3d at 33 (citing case law).  The showing of such a conflict would normally satisfy the Johnson Act and make out a federal claim for relief.  See, e.g., Mississippi Power & Light Co. v. Mississippi, 487 U.S. 354, 377 (1988).

The issue in this case is not about these principles, which are well-settled, but about whether on the facts before us the challenged orders of the state commission are inconsistent with a federal regulatory scheme.  Patently, the state commission is refusing to allow Connecticut Valley to collect revenues to pay the full federal tariff rate for the power it is buying from Central Vermont under the RS-2 tariff; indeed, the refund ordered by the Commission is designed to make Connecticut Valley give back to customers some of the revenue it collected for that purpose.

Of course, FERC has not ordered the state commission to do anything; it has merely allowed Central Vermont to file a federal tariff (the RS-2 tariff) setting a rate for wholesale power sales to Connecticut Valley.  But if the purchase is not improper, then the refusal of the state commission to allow the purchasing utility to pay the federal tariff rate, and include that cost in its own rates, is inconsistent with the federal scheme.  The reason is that the rates set by the FERC tariff are

binding unless and until altered by FERC.  See Mississippi Power & Light Co., 487 U.S. at 371-74; Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 970 (1986).

Nevertheless, while the Supreme Court left the issue open, we held in Patch V that a state commission could disallow costs, even where they reflected payments required under a federal tariff, where the state agency had a colorable independent state ground for finding that the purchaser should not have made the purchase.  167 F.3d at 35; see also Kentucky W. Va. Gas Co. v. Pennsylvania Pub. Util. Comm'n, 837 F.2d 600, 608-09 (3d Cir.), cert. denied, 488 U.S. 941 (1988).  And, initially,  the Commission did make a colorable ruling in its Disallowance Order that Connecticut Valley's continued purchasing from Central Vermont was imprudent, given Connecticut Valley's apparent opportunity to terminate its contract on one year's notice and switch to cheaper--albeit possibly short-term--power from other suppliers.

But faced with the threat of termination, Central Vermont then filed a tariff amendment that now threatens to impose a heavy termination charge on Connecticut Valley if it does cancel its contract.  FERC (which more or less invited the amendment) has allowed the amendment to go into effect provisionally and, while FERC may in due course disallow the

-11-

charge or reduce its amount, the amendment is in force for the time being. See 82 F.E.R.C. ¶ 61,237, at 61,909 (1998) ("Central Vermont's proposed exit fee is hereby accepted for filing and suspended for a nominal period, to become effective on March 14, 1998, subject to refund . . . ."). Further, the state commission has now, in its Vacation Order, explicitly withdrawn the prior ruling that Connecticut Valley should terminate its requirements contract. In sum, the Commission's prior justification for disallowing the pass-through has evaporated.

The Commission says on appeal that its Vacation Order only nullified its prior order requiring Connecticut Valley to terminate the contract and did not affirmatively order the utility to continue buying under the contract. The lack of an affirmative order is irrelevant: the RS-2 contract requiring purchases is binding on Connecticut Valley unless terminated; termination now apparently would be self-defeating because it would give rise to the prospect of a potentially heavy financial penalty that the state commission does not want;[3] and so long as

---

[3]Seemingly, a large exit fee would negate the savings realized from having Connecticut Valley purchase cheaper power in the short term from wholesalers other than Central Vermont; and, of course, Connecticut Valley would also lose the long-term rate protection afforded Connecticut Valley's customers by the long-term contract between Central Vermont and Hydro Quebec.

purchases from Central Vermont continue to be legitimately made under the contract, Connecticut Valley must pay the FERC tariff rate, and the state commission must allow it to reflect that rate in its own charges.

Alternatively, the Commission says that even if current conditions make it prudent to continue the purchases, the contract could and should have been terminated before Central Vermont filed the termination charge. However, read literally, FERC regulations say that Central Vermont could have imposed the termination charge, assuming it were otherwise justified, whenever Connecticut Valley sought to terminate its contract--so long as the contract was still in force when the charge was filed. 18 C.F.R. § 35.26(c)(1)(v) (1999). The RS-2 contract required at least one-year's notice before termination became effective.

The Commission points to language in the original FERC order adopting such regulations, arguably contrary to the present regulation itself, saying that a selling utility could not add an exit fee after a purchasing utility "gives notice" of termination. Order No. 888, Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, 61 Fed. Reg. 21,540, 21,642 n.679

-13-

(1996).  However this arguable tension between the regulation and order may be resolved, it is hard to see how Connecticut Valley--a wholly-owned subsidiary--could have effected a surprise termination.[4]  Also, the FERC order says that even where notice is given, the seller could still recover its stranded costs through transmission charges to the canceling utility.  Id.

Finally, the Commission, joined in a separate amica curiae brief by the Governor of New Hampshire, claims that whether the continued purchases are imprudent under state law is a matter for the Commission and the state courts, and that the district court's injunction is inconsistent with the so-called Burford doctrine.  See Burford v. Sun Oil Co., 319 U.S. 315, 332-34 (1943).  Burford, discussed at some length in Patch IV, 167 F.3d at 24, aims to prevent federal courts from "bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution."  Id.

---

[4]Even if we put aside the fact that Connecticut Valley is a wholly-owned subsidiary of Central Vermont, it would have been easy enough for Central Vermont, at the first sign of an intent to terminate or at any sign of pressure from the Commission on Connecticut Valley to terminate, to file its termination charge with FERC.  Indeed, this is more or less what happened.

-14-

However, we are not concerned here with whether the imprudence finding is proper under state law but rather with whether, given its substance and context, it furnishes a basis for the state commission to ignore an otherwise controlling FERC tariff. In such cases, the "adequacy" of an asserted "independent state ground" is--indeed, under the Supremacy Clause must be--an issue of federal law.[5] <u>Burford</u> does not license a state to ignore FERC tariffs merely by saying, without any present rational basis, that the purchase is "imprudent." This is so even if the Commission's "imprudence" finding has not been withdrawn and is still tolerated under state law.

Nor is it of any moment whether the Commission has, or has not, acted in good faith in refusing to allow Connecticut Valley to collect the FERC tariff charges. Indeed, we assume throughout that the Commission is motivated simply by a desire to secure lower rates for New Hampshire consumers. But absent a colorable objective justification, the state agency may not disallow, in state rate-making proceedings, costs that were

---

[5]<u>See</u> <u>Howlett</u> v. <u>Rose</u>, 496 U.S. 356, 366 (1990) ("The adequacy of the state-law ground to support a judgment precluding litigation of the federal claim is itself a federal question which we review de novo."); <u>see also</u> <u>Wolfe</u> v. <u>North Carolina</u>, 364 U.S. 177, 185-86 (1960); <u>Staub</u> v. <u>City of Baxley</u>, 355 U.S. 313, 318-19 (1958); <u>Ward</u> v. <u>Board of County Comm'rs</u>, 253 U.S. 17, 22-23 (1920).

-15-

incurred under a federal tariff for a permissible purchase of wholesale power.

Affirmed.